**FIRST NATIONAL BANK IN ALBUQUERQUE, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 89–9011.

United States Court of Appeals, Tenth Circuit.

Dec. 19, 1990.

---

John A. Budagher, Albuquerque, N.M., for petitioner-appellant.

William A. Whitledge (Peter K. Scott, I.R.S., Jonathan S. Cohen, Gary R. Allen, Janet Kay Jones, and Shirley D. Peterson, U.S. Dept. of Justice, Tax Div., Washington, D.C., with him on the briefs), for respondent-appellee.

Before LOGAN, ANDERSON and EBEL, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

The First National Bank in Albuquerque ("First National" or "Bank") appeals from a decision of the United States Tax Court holding that the Bank realized taxable income in 1980 as the result of a disposition of an installment obligation within the meaning of § 453(d) of the Internal Revenue Code of 1954 ("Code"). We affirm on the basis of §§ 453(a) and (b) of the Code because the installment obligation was paid in full, in cash, in 1980.

## BACKGROUND

On July 9, 1979, First National sold its old bank building and the underlying real estate in Albuquerque, New Mexico (the "property" or "Old Bank Building") to a partnership ("Partnership") formed by two real estate developers for the purpose of acquiring, renovating, and operating the property. The sale price was $1,735,000 with $400,000 paid in cash at closing and the balance of $1,335,000 to be paid to First National in installments over a period of years, subject to various terms and conditions. First National also committed to provide up to $3,065,000 in construction financing to the Partnership for the rehabilitation of the property. The combined $4,400,000 financing for both the property and construction was subject to the Bank's lending limit.

The terms of the sale and of the construction financing were set forth in a Purchase Agreement signed by First National and the general partners of the partnership on June 14, 1979, and in a number of additional documents executed in connection with the closing of the transaction on July 9, 1979. Those documents included a Loan Agreement, a Mortgage, a Security Agreement, an Assignment of Rentals and Leases, a Purchase Money Promissory Note from the Partnership to First National, and a Construction Loan Promissory Note from the Partnership to First National (collectively referred to as the "sale documents"). The provisions of all of these documents, including the Purchase Agreement, were expressly integrated and survived the closing; and, the provisions of the original Loan Agreement or any future permanent Loan Agreement controlled in the event of conflict with the Purchase Agreement. By these documents First National contractually bound itself to provide permanent financing for the Partnership's acquisition and rehabilitation of the property. The permanent financing would either be a conventional long-term loan from the Bank, or by way of municipal redevelopment bonds ("bonds").

From the outset the parties planned to use the vehicle of bond financing (industrial development bonds qualifying under section 103 of the Code) for both the property acquisition and the construction loan because the tax advantages associated with that form of financing significantly reduced costs to the Partnership and exempted interest payments to the Bank from taxation. In short, the use of municipal bond financing made the deal feasible economically. However, New Mexico's enabling legislation for municipal bonds, though passed, was not effective at the time the parties signed the Purchase Agreement,[1] and it would take several months following the closing on July 9, 1979, to complete the necessary paperwork and obtain final approval from the City of Albuquerque ("City") for the issuance of bonds for the project. That process began in May, 1979, with a City resolution of intent to issue redevelopment bonds to finance the Old Bank Building acquisition and renovation project, when permitted by law to do so.

Accordingly, at the closing the parties contracted for what was essentially interim financing, to be superseded by permanent financing, with the terms in respect of each of those obligations expressly spelled out. The terms of the $1,335,000 installment sale obligation of the Partnership were set out in the Purchase Note, which was nonrecourse and subordinated to the construction loan. The Purchase Note, dated July 9, 1979, bore interest at the rate of 9% per year on the unpaid principal balance, with accrued interest only payable on December 14, 1980, or on the completion of construction (a defined term), whichever came earlier, and principal and interest payable thereafter on the basis of a 33 year amortization amounting to $10,560.32, monthly, beginning January 1, 1981, or the first day of the first month after completion of construction, and a final balloon payment of $1,136,159.51 on the first day of the 181st month.

The initial terms of First National's construction loan to the Partnership were set out in the documents of sale and, more particularly, in the Construction Note. The Construction Note provided for interest tied to a defined prime rate, floating between 12% and 14% per year on the unpaid balance. Consistent with the Purchase Note, interest and principal were to be paid on December 14, 1980, or the completion of construction, whichever came first.

Provisions governing the permanent financing, whether bonds or a conventional loan, were contained in the Loan Agreement, as follows:

6. *Permanent Loan Committment* (sic): On or before the earlier of (i) six months after the issuance of a Certificate of Occupancy by the City of Albuquerque, or (ii) December 14, 1980, (the "Limitation Period") Bank will provide permanent financing to Borrower (the "Permanent Loan") in accordance with this Loan Agreement and under the following conditions and requirements:

A. Bank will lend Borrower, or purchase Bonds in, an amount equal to the then outstanding combined amount of the Subordinated Purchase Money Note and the Construction Loan, but in no event more than $4,400,000 or Bank's then current lending limit, whichever is less (the "Permanent Loan Maximum"). Bank will use its good faith efforts to obtain participation from other lending institutions for amounts over Bank's lending limits. If Bank is unable to obtain such participation, despite its good faith efforts to do so, Borrower will obtain an alternative financing source for the amounts over Bank's then current lending limit, in which event Bank will prorate, if feasible, the collateral securing the Permanent Loan to the amount participated.

B. The Permanent Loan may be in the form of a conventional financing arrangement ("Conventional Financing") or tax-exempt bonds or similar tax-exempt obligations, issued by the City of Albuquerque ("Bond Financing"). In either

---

1. The New Mexico Legislature enacted the Metropolitan Redevelopment Code of the State of New Mexico, N.M. Stat.Ann. § 3–60A–1 to –48 (1978) in March, 1979, to become effective July 1, 1979.

event, the General Partners of Borrower will have no personal liability on the Permanent Loan.

C. Borrower will, immediately upon the execution of this Loan Agreement, proceed with obtaining the issuance by the City of Albuquerque of tax-exempt bonds or other similar tax-exempt obligations (the "Bonds"), pursuant to the authority of the City of Albuquerque under its Charter and the laws and Constitutions of the State of New Mexico and United States, in an amount at least equal to the Permanent Loan Maximum. If the following conditions are met, Bank will buy a dollar amount of Bonds at par at such time and in such amounts as it desires or will bid at a public sale of the Bonds, up to the Permanent Loan Maximum:

(1) The Bonds are available to be purchased by Bank prior to the expiration of the Limitation Period.

(2) The Bonds are issued under terms, conditions, and documents acceptable to, and approved by, the Bank.

(3) If, in the opinion of Bank's counsel that such an opinion is necessary, Bank has received an unqualified approving opinion of nationally-recognized bond counsel to the City of Albuquerque, approved by the Bank and in form and substance satisfactory to the Bank, including but not necessarily limited to the opinion of such counsel that (i) interest earned on the Bonds is exempt from federal and New Mexico income taxation and (ii) the Bonds are valid and binding obligations of the City of Albuquerque, to the extent of the law, are in full force and effect, are enforceable in accordance with their terms, and in accordance with the terms of other Documents and instruments relating to the Bonds, and were issued in full compliance with the Constitution of the United States and of the State of New Mexico, and applicable federal, state, and local legislation, rules and regulations.

(4) Bank has received the opinion of bond counsel, Bank's counsel, or Borrower's counsel that the Bonds, when purchased by Bank, are qualified or allow-able investments to be held in Bank's investment portfolio.

(5) The Bonds are issued with maturities varying from one to thirty-three years and bear interest of no more than 7½% a year, all as agreed to by Borrower and the Bank.

(6) Payment of the Bonds is secured by a first lien on the Project, and such other security as may be required by Bank of Borrower, including, but not necessarily limited to, the assignment of a lease, in form and on terms acceptable to the Bank, between Borrower as lessee and the City of Albuquerque as lessor.

(7) The value of the Project or other security securing the Bonds is satisfactory to Bank.

(8) The proceeds of the Bank's purchase of the Bonds will be used to only pay amounts, costs or expenses approved by Bank.

D. The Conventional Financing will be subject to the following terms and conditions (the "Conventional Financing Terms"):

(1) The Permanent Loan will be evidenced by a promissory note or notes executed and delivered by the Borrower to Bank (the "Permanent Loan Note").

(2) The Permanent Loan Note will bear interest at an average rate of 10% a year.

(3) The Permanent Loan will have a maturity of fifteen years, with payments based on a thirty-three year amortization, payable in 179 equal monthly installments beginning on the first day of the first calendar month following funding of the Permanent Loan and one final payment of principal and interest on the first day of the 180th calendar month following funding.

(4) The Permanent Loan Note will be secured by a first mortgage on the Project, a security agreement, an assignment of rentals and leases, and by such other security as Bank may require.

E. Bank will lend to Borrower, and Borrower will borrow from Bank, the Permanent Loan, in an amount up to the Permanent Loan Maximum, subject to

the Conventional Financing Terms, if the Bonds are not available for purchase by Bank within the Limitation Period.

Ex. 10–J at 17–20.

On May 1, 1980, the bond financing arrangements were completed and put in place. The following events happened simultaneously on May 1, 1980, to effectuate the transition to bond financing for the project. The City of Albuquerque issued $4,400,000 in metropolitan redevelopment revenue bonds (Old First National Bank Project), with serial maturities over thirty-three years, and bearing interest at the rate of 7½% per annum. First National purchased $3,600,000 of those bonds, its lending limit, issuing its check to the City of Albuquerque in that amount. By previous arrangement, the First National Bank of Dallas ("Dallas Bank") purchased the remaining $800,000 of the bonds, issuing its check to the City of Albuquerque therefor. The $4,400,000 paid for the bonds went into a special City of Albuquerque trust account at First National, referred to as the Acquisition Fund.

The Partnership conveyed the property to the City of Albuquerque, and leased the property back from the City upon lease payments exactly equal in amount and duration to the sums necessary to pay off the bonds over thirty-three years. The lease payments would flow directly into a special bond account from which payments on the bonds were made to the banks. Under the terms of the lease the City was obligated to reconvey the property to the Partnership at the end of the thirty-three year term for a sum of $1,000 provided, of course, that all of the "lease" payments had been made as specified in the interim, retiring the bonds.

The bond principal and interest were not obligations of the City, but were to be paid by the lease payments. The bonds were secured by a mortgage on the property and an assignment of rents.

A number of integrated documents governed these and related terms of the bond transaction. The main instruments in addition to the bonds themselves were a Mortgage and Indenture of Trust between the City and First National, as trustee ("Inden-

ture") and a Lease Agreement between the City and the Partnership ("Lease"). Pursuant to both the Indenture and Lease, First National, as trustee of the Acquisition Fund, was authorized and directed to pay out of the Acquisition Fund amounts necessary to pay for the cost of acquiring the property, and construction costs to date. Lease, section 4.4(b), (d). The Purchase Note and Construction Note were to be liquidated. Lease, section 4.4(j). Accordingly, First National, as trustee, transferred to itself from the $4,400,000 Acquisition Fund $1,335,000 as payment in full of the Purchase Note, plus an amount equal to the sums advanced to date on the Construction Note, which was also paid in full by the transfer. The Purchase Note was satisfied on First National's books by the payment from the Acquisition Fund.

The Commissioner has treated the Partnership's "lease" payments to the City of Albuquerque as payments on the bonds, and the partnership as the owner of the property. Accordingly, that portion of the "lease" payments attributable to interest payments on the bonds, is permitted by the Commissioner to be expensed by the Partnership as an interest payment; and, the balance of the "lease" payments are not deductible as an expense. The Partnership is both required and permitted to depreciate the Old Bank Building which it has done using a thirty-two year life and the straight-line method.

First National timely elected to treat the sale of the property as an installment sale under § 453 of the Code. Accordingly, on its 1979 and 1980 tax returns it reported only that portion of the proceeds from the sale which it deemed it had actually received as installment payments. After an audit, the Commissioner determined that First National had "disposed of an installment obligation upon the exchange of such obligation for Albuquerque Industrial Revenue Bonds in 1980," and that "[s]uch disposition result[ed] in a taxable exchange to the extent of the difference in the face amount of the bonds and the basis of the obligation." Ex. 4–D. Accordingly, the Commissioner increased First National's

taxable income in the amount of $1,062,000 for the 1980 tax year.

First National challenged that determination and filed a petition in the tax court for a redetermination of the proposed deficiency. The tax court ruled in favor of the Commissioner. This appeal followed.

None of the underlying facts referred to above are in dispute. The dispute in this case centers on the conclusions to be drawn from those facts. Some of those conclusions are pure questions of law; others are mixed questions of fact and law.

 The factual findings of the tax court are reviewable under the clearly erroneous standard, the same standard as civil bench trials. 26 U.S.C.A. § 7482(a); Fed.R. Civ.P. 52(a); *Dolese v. Commissioner*, 811 F.2d 543, 546 (10th Cir.1987). However, findings of law and of ultimate fact derived from applying legal principles to subsidiary facts are subject to *de novo* review. *Pollei v. Commissioner*, 877 F.2d 838, 839 (10th Cir.1989); *In re Golf Course Builders Leasing, Inc.*, 768 F.2d 1167, 1169 (10th Cir.1985).

## DISCUSSION

 Under § 453 of the Code a taxpayer may, under certain conditions, elect to report the gain from the sale of real property using the installment method of accounting. Under this method the taxpayer must include in gross income each year that proportion of installment payments actually received which the gain, realized or to be realized when payment is completed, bears to the total contract price. 26 U.S.C. § 453(a)(1), (b) (1954); *see, e.g.,* Rev. Rul. 75-457, 1975-2 C.B. 196.

Section 453(d) of the Code provides, in part, that if an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or (B) the fair market value of the obligation at the time of distribution, transmission, or

disposition, in the case of the distribution, transmission or disposition other than by sale or exchange. *Id.*

The test for taxable income under § 453(a)(1) and (b) is simply the receipt during the tax year of a payment or payments in respect of the property sold and previously reported on the installment method. Payments are taxable in the year received.

In general, the test for disposition under § 453(d) is as follows:

[S]atisfaction or disposition under section 453(d) of the Code occurs when the rights accruing to the seller under an installment sale either disappear or are materially disposed of or altered so that the need for postponing recognition of gain otherwise realized ceases. The mere substitution and release of the original obligor on an installment obligation, and the assumption of the installment obligation by a new obligor, without any other changes, will not in itself constitute a satisfaction or disposition under section 453(d).

*Id.*

First National argues that the changes in financing terms effected by the switch from notes to bonds—all as contemplated and contracted for from the beginning—were simply an internal progression which did not materially change the Bank's status as an installment seller of the property in question. It asserts that the bonds merely substituted for the Purchase Note, leaving the Bank to continue to look to the Partnership and the property as both the source of payment and security for the unpaid balance; and, the $1,335,000 unpaid balance on the property continued to be outstanding. In short, both the need for postponing the recognition of gain on the sale of the property, and qualification under the statute to do so, never ceased.

The tax court focused on the fact that in effectuating the switch from Purchase Note to bond financing cash was physically transferred to pay off the Purchase Note. The court reasoned that this transfer of cash was dispositive and it was, therefore, immaterial that the Bank was left with an

identical amount receivable from the Partnership with respect to the property, although in the form of bonds issued by the City, held by First National, and payable by the Partnership. The court said:

> Petitioner did not "substitute" the bonds for the purchase note, but liquidated it with "physical cash" from the bond proceeds.
>
> . . . .
>
> It is a basic tenet of income taxation that income is realized when there is a cash liquidation at face value of an installment obligation. Burrell Groves, Inc. v. Commissioner, 22 T.C. 1134, 1136 (1954), affd. 223 F.2d 526 (5th Cir.1955). See Roche, Disposition of Installment Obligations, 41 Tax L.Rev. 1, 5 n. 14 (1985). This tenet is dually grounded in an accretion to wealth theory and in the assumption that once the taxpayer has been paid for the note he has the ability to pay the tax liability. By liquidating the purchase note, petitioner has both experienced an accretion to wealth and has obtained the wherewithal with which to pay the tax liability.

R. Doc. 14 at 14, 16.

On appeal, the Commissioner adopts the same reasoning, but asserts that the tax court erred by basing its decision on § 453(d). The Commissioner argues that the cash transfer and payoff of the Purchase Note constituted full cash payment of the installment obligation, taxable under §§ 453(a)(1) and (b). Alternatively, the Commissioner argues that there was in fact a disposition of the installment obligation under § 453(d) when the financing was switched from notes to bonds. He asserts that there were material differences between the Purchase Note and the bonds, including different interest rates, obligors, and payment periods.

While the tax court and the Commissioner have focused mainly on the liquidation of the Purchase Note in the transition from note to bonds, our analysis starts at a more fundamental level. First National argues that in substance it did not get paid for its property because following the bond financing it still held a receivable from the Partnership (bonds) equal to the original unpaid balance on the Purchase Note; hence the net economic effect to the Bank never changed. Such an argument, if carried to its logical conclusion, would mean that a bank could make an ordinary commercial loan to a person who used the proceeds to buy bank property, or, conversely, sell the property on a note, then make an ordinary commercial loan to the buyer who pays off the note, and treat the subsequent loan payments as an installment sale. In each case according to First National's argument, the supposed net economic effect to the bank would be the same as far as receivables are concerned. In other words, First National's position suggests that a property seller bank could never make a commercial loan to the property buyer who uses the loan in connection with the property acquisition. The congruence of those elements would transform the loan into an installment sale of the property. These are manifestly incorrect propositions, so the "net economic effect" argument cannot be controlling.

Since the character of an ordinary commercial loan would not change in the general circumstances just described, we must next ask whether the bond financing vehicle as structured in this case would have qualified for installment sale treatment if it had been employed at the outset. Research has disclosed no authorities which would provide a direct answer to that question, and neither party has developed the point. However, we conclude that the answer must be in the negative; a fortiori the bond refinancing in 1980 does not qualify for installment sale treatment. A nonqualifying transaction does not become less so simply because it replaces a qualifying transaction.

The structure of an industrial revenue bond transaction is well known, and is summarized in Private Ruling 8727008, which we do not cite as precedent, but only to give authorship credit for an apt descriptive summary of information available elsewhere:

> Rev. Rul. 68–590, 1968–2 C.B. 66, demonstrates that for tax purposes other than

exemption under section 103 of the Code, *the non-exempt person for whom an industrial revenue bond has been issued may be regarded, in substance, as the issuer.* Rev. Rul. 68–590 concluded that the non-exempt user, even though it leases from the political subdivision, is entitled to an interest deduction, a section 38 property credit, depreciation, and other tax attributes of *an owner and obligor,* because "[t]he substance of a transaction, rather than its legal form, is controlling for federal income tax purposes." (quoting Helvering v. Lazarus and Co., 308 U.S. 252 [60 S.Ct. 209, 84 L.Ed. 226] (1939), Ct. D. 1430, C.B. 1939–2, 208).

(Emphasis added).

The Commissioner acknowledges as much in its brief on appeal, stating:

> The lease payments exactly equaled the amounts required to meet the principal and interest payments on the bonds. The lease payments flowed through the bond fund and into taxpayer's own account as bond payments. The partnership expensed the interest portion of the lease payments, and depreciated the building on a 32–year life under the straight-line method.

Brief for the Appellee at 5, n. 3.

By the same reasoning that the Partnership is, in substance, the obligor in the bond transaction, First National is the obligee, and they bear that relationship to one another (the City is a conduit). In that respect we agree with First National. But obligor and obligee as to what? As to an essentially ordinary commercial loan relating to the acquisition of property, or as to an installment sale of the property? We think the former.

Typically a property seller and the institution which finances revenue bonds are different entities. Revenue from the bond purchase is used, in part, to pay off the seller, and the seller is taxable on the proceeds. The fact that First National was both the seller and a financing institution in this transaction does not effect a merger of the two roles. Certain aspects of the transaction in question illustrate the point.

First, although the record is almost silent on the subject, we suspect that First National treated the Purchase Note receivable and the bond financing differently on its books for accounting and regulatory reporting purposes because they fell in entirely different categories. For example, the bond financing was conditioned upon the bonds being "qualified or allowable investments to be held in the bank's investment portfolio." Loan Agreement, par. 6.C.(4). And, the Purchase Note was subordinated to the Construction Note. Likely the installment sale would have been carried on the Bank's books and reports as other property owned, while the bond financing would be reported in the category of loans. Also likely is the fact that a default on the Purchase Note would have been reported differently by the Bank than a default on the bonds. They would impact different lines on the Bank's statements. In fact, we seriously doubt that the regulators and the Bank's accountants would have permitted the Bank to treat the extension of credit for bonds, and the principal and interest payments on those bonds, as a real estate sale, or to merge the bond purchase into the property installment sale for financial accounting and regulatory reporting purposes. In any event, those suppositions do not control our decision. The point is that First National, which has the burden of proof, introduced no evidence that the two Partnership obligations (Purchase Note and bonds) were, or could be, treated as qualitatively identical receivables on the Bank's books, financial statements, and regulatory reports.

Second, the bond financing lumped the unpaid portion of the purchase price with the construction financing outstanding, construction funds yet to be disbursed, and sums for costs and expenses. The property obligation represented by the Purchase Note completely lost its separate identity in the bond financing which created a unitary obligation for $4,400,000. No mechanism existed, for instance, to allocate a partial default on the bond payments between property and construction financing. The Purchase Note subordination to the Con-

struction Note disappeared. The Purchase Note account disappeared.

Third, the Dallas Bank purchased $800,000 of the bonds and that amount was a fungible item in the Acquisition Fund. The Dallas Bank and First National are indistinguishable in their relationship to the bond financing. Both purchased bonds for cash and are obligees of the Partnership's obligation to pay off the bonds out of rents. It is wholly illogical in these circumstances that the identical bond obligation would be, in effect, simultaneously a commercial loan between the Dallas Bank and the Partnership, but an installment sale of real estate between First National and the Partnership. (It is just as illogical to view the undivided "lease" payments to the Bank as being comprised of two separate obligations: construction loan and real property purchase payments). Furthermore, because the $800,000 paid into the Acquisition Fund by the Dallas Bank was fungible with amounts paid in by First National, part of the money used to pay off the Purchase Note (or to pay for the property if bonds were used at the outset) came from the Dallas Bank—a point not addressed by either party.

The fact that money had to be physically transferred from the Acquisition Fund to First National to pay off the Purchase Note tells as much about the distinct character of the bond financing as it does about the satisfaction of the note. First National could not record the satisfaction as a mere internal bookkeeping entry. It had to look to a separate fund (ergo a separate extension of credit) for actual payment. The lease terms authorized and directed the Partnership and the Bank, as trustee, to "liquidate" the Purchase Note obligation of the Partnership with money out of the bond Acquisition Fund.

Finally, the bonds, the Indenture, Lease and other bond documents, the payments of money, the Bank accounts, and other aspects of the bond financing on their face evidence nothing more than commercial financing in the usual form for industrial development bonds.

In sum, both in form and in substance the bonds here were in the nature of a commercial loan, as described at the beginning of our analysis, not an installment sale of property. As structured, the use of bonds as a financing vehicle would not have entitled the Bank to installment sale treatment if used at the outset, and does not qualify by being inserted later.[2] First National has not called our attention to any authority on point which would support a contrary conclusion. Accordingly, we hold that the payoff of the Purchase Note with bond proceeds in 1980 terminated the installment sale and caused First National to realize taxable income pursuant to sections 453(a) and (b) of the Code.

Because of this conclusion it is unnecessary for us to address the other arguments of the parties.

AFFIRMED.

---

**2.** Terms and structure do count; therefore, we express no opinion as to whether a bond transaction structured differently might allow a seller to use the installment method. We address only the circumstances before us.