CHARLES F. AND KIM K. URBAUER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Urbauer v. Commissioner
Docket No. 11173-90
United States Tax Court
T.C. Memo 1992-170; 1992 Tax Ct. Memo LEXIS 181; 63 T.C.M. (CCH) 2492; March 24, 1992, Filed *181 Decision will be entered under Rule 155. Charles F. Urbauer, pro se. Dennis G. Driscoll, for respondent. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)(A)
6653(a)(1)(B)
6661
1985
$ 15,871
--
--
$ 758
50% of the
1986
$ 2,636
$ 564
interest due
--
on $ 2,636
50% of the
1987
$ 1,388
$ 363
interest due
--
on $ 1,388
All section references are to the Internal Revenue Code as in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All references to petitioner or Mr. Urbauer are to Charles F. Urbauer, and all references to Mrs. Urbauer are to Kim K. Urbauer. Petitioners contend that the primary issue before this Court is the validity of a lien respondent obtained, by means of a 1990 jeopardy assessment, on the proceeds of sale of petitioners' house. They go on to argue that in securing this lien respondent arbitrarily and without due process added additions to tax and interest *182 to deficiencies to petitioners' Federal income tax liabilities for the taxable years 1980 through 1984. However, as we told petitioners at the trial, we do not have jurisdiction over any issues concerning the validity of this lien or the circumstances in which it was obtained. [1]
After concessions by the parties, the following issues remain for decision: (1) Whether petitioners are entitled to certain deductions under sections 162(a) and 274 in connection with "promotional" expenses they incurred at the Detroit Golf Club for each of the taxable years at issue; (2) whether petitioners are entitled to a charitable contribution deduction under section 170 in excess of the amount allowed by respondent for the taxable year 1986; (3) whether certain amounts spent by petitioners in connection with treatment of one of their *183 sons for behavioral and drug problems are deductible in 1987 as medical expenses under section 213; (4) whether petitioners are liable for additions to tax for a substantial understatement of income tax under section 6661 for the taxable year 1985; and (5) whether petitioners are liable for additions to tax for negligence or intentional disregard of the rules under section 6653(a) for the taxable years 1986 and 1987. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by this reference. At the time the petition was filed, Mr. Urbauer resided in Keego Harbor, Michigan, and Mrs. Urbauer resided in Bloomfield Hills, Michigan. Mr. Urbauer resided in Troy, Michigan, and Mrs. Urbauer resided in Royal Oak, Michigan at the time of trial. Petitioners were married and filed joint Federal income tax returns for the years 1985, 1986, and 1987, but they were divorced at the time of trial. Kristine, John, and Eric are the children of this marriage. During the taxable years in issue, as in prior years, Mr. Urbauer was self-employed as a financial and investment consultant, and his primary business was selling interests in limited partnerships and private *184 offerings as investments. His efforts to sell these investment products became increasingly difficult with the intimations of, and then, passage of the 1986 Tax Reform Act. [2]
The chief marketing tool used by Mr. Urbauer to sell his products was petitioners' proficiency as better-than-average golfers. [3] Petitioners were members of the Detroit Golf Club (the Club), a private country club, which they joined primarily to meet potential business clients and to reduce Mr. Urbauer's business advertising costs. Petitioner believed that the members of the Club were well-off financially, and he viewed each of them as a potential client. *185 Promotional Expenses
Petitioners frequently participated in golf tournaments and bowling leagues sponsored by the Club. During these events, petitioners discussed with the other participants Mr. Urbauer's business and the various investment opportunities he could offer them. Mr. Urbauer typically had more substantive business discussions with these individuals over lunch or dinner immediately after the golf or bowling match. Through these events and the discussions that followed, Mr. Urbauer formed new business relationships and strengthened existing ones. In addition to membership dues, the Club charged petitioners an entry fee to participate in Club sponsored golf tournaments and bowling leagues. Petitioners also incurred out-of-pocket expenditures, such as caddie fees and meals, because of their participation in these tournaments and leagues. Petitioners charged these fees and expenditures to their Club account. Petitioners, and other Club members, were assessed periodic fees for golf club storage and "hole-in-one" awards. [4] Petitioners were charged an annual fee for the Club magazine, a publication in which Mr. Urbauer advertised his business. These fees were *186 charged to petitioners' Club account, and assessed regardless of how often or how much petitioners used the Club's facilities. Petitioners received a member's statement from the Club at the end of each month, showing all fees and charges to their account for the preceding month. Mr. Urbauer marked the charges listed on the member's statement as either personal or business related. Petitioner denoted a personal charge on the member's statement by placing a circle or square around the charge and a "P" next to the charge. For the remaining charges, petitioner either recorded the specific names of prospective clients entertained, or labeled them "promotion" or "prom". The charges Mr. Urbauer labeled as "promotion" or "prom" were for golf tournaments, bowling leagues, golf club storage fees, "hole-in-one" awards, the Club magazine, and *187 other miscellaneous debits. On their Federal income tax returns for 1985, 1986, and 1987, petitioners claimed business expense deductions of 84 percent, 93 percent, and 93 percent, respectively, of their Club membership dues. These deductions resulted from petitioners' computation of their time spent at the Club for business purposes, including their participation in Club sponsored golf tournaments and bowling leagues. After disallowing these claimed deductions, respondent conceded them prior to trial. Petitioners also claimed a business expense deduction for those amounts they labeled as "promotion" or "prom". Their deduction of these "promotional" expenses has been disallowed in full by respondent. Charitable Contributions
Petitioners claimed charitable contribution deductions of $ 14,011 on their 1986 Federal income tax return. Respondent disallowed deductions for certain cash contributions petitioners made to local secondary schools. Respondent also determined that the fair market value of certain tangible property donated by petitioners was less than the value petitioners claimed on their 1986 Federal income tax return. In 1986, petitioners' daughter, Kristine, *188 was a member of her high school musical group known as the Mercyaires. On February 21, 1986, petitioners paid $ 17.50 for five tickets to a Mercyaires benefit concert. Petitioners received and kept the tickets, although they did not attend the concert. Petitioners paid $ 60 on May 25, 1986, for tickets to the Mercyaires yearend spaghetti banquet. Petitioners and their children did attend this event that was held in the school cafeteria, and catered by the Mercyaires and their parents. Mrs. Urbauer served as chairperson of the University of Detroit High School (Detroit High School) auction during 1986. The Detroit High School auction is a 2-day event that includes a Friday preview of the items to be auctioned, a Saturday auction, and a silent auction held on both days. On Friday, October 24, 1986, Mrs. Urbauer, as auction chairperson, cashed two of her personal checks at the Detroit High School. Each check was in the amount of $ 10, and the proceeds of each check were spent by the Detroit High School auction committee on retail purchases of several items to be auctioned. As auction chairperson, Mrs. Urbauer made opening bids on items included in the silent auction. After *189 the Friday preview, Mrs. Urbauer gave $ 105 to Detroit High School, an amount equal to the total value of her opening bids on silent auction items for which no other bids were received. Petitioners did not take possession of these items; instead they intentionally left them with the Detroit High School auction committee for inclusion in the silent auction held on Saturday. Petitioners also donated $ 120 to Detroit High School to be used as airfare in a vacation package that was auctioned on Saturday, October 25, 1986. Mr. Urbauer made bids on auction items, and wrote a check in the amount of $ 430 to the Detroit High School during the auction. On December 9, 1986, Mrs. Urbauer paid $ 50 to Detroit High School for auction items that had not been claimed. In return for this payment, petitioners took possession of these unclaimed auction items. Petitioners wrote a check, as a result of a neighbor's fundraising solicitation, in the amount of $ 47.24 to Cranbrook Middle School on October 21, 1986. Petitioners donated one complete solid oak bedroom set and several other pieces of matching wood furniture to the Furniture Resource Center [5] during the taxable year 1986. On attachment *190 A to Form 8283 of their 1986 Federal income tax return, petitioners estimated that their cost basis in the furniture was $ 3,330, and they claimed a charitable contribution of $ 2,385. Petitioners also donated clothing, toys, books, furniture, artwork, carpeting, and other assorted items to the Saint Vincent DePaul Society during the taxable year 1986. On attachment B to Form 8283 of their 1986 Federal income tax return, petitioners estimated that their cost basis in these items was $ 11,875, and they claimed a charitable contribution of $ 2,790. The furniture that petitioners donated to the Furniture Resource Center was of excellent quality and in good condition. The items that they donated to the Saint Vincent DePaul Society were of good quality and in fair condition. Medical Expenses
John Urbauer, petitioners' 17-year-old *191 son, experienced severe behavioral problems as a result of habitual drug use during 1986 and 1987. In 1987, petitioners enrolled John in the DeSisto School (DeSisto) for treatment of these problems. DeSisto is a college-preparatory school located in Stockbridge, Massachusetts. The curriculum at DeSisto is designed to address both the educational and emotional needs of its students. DeSisto facilitates the student's emotional development through a holistic program that includes community interaction, peer support, and weekly therapy sessions. DeSisto also uses a multifamily therapy program called "Parent/Child Communication Groups" to treat the emotional needs of its students. Parents of Desisto students are required to provide money for their child's "personal account" and "allowance account", in addition to tuition, room, board, and therapy charges. Petitioners traveled to and from DeSisto to participate in John's therapy sessions with DeSisto staff members. These therapy sessions, including petitioners' attendance, were a requirement of John's continued enrollment and treatment at DeSisto. In addition to airfare, petitioners incurred expenses for hotels, rental cars, meals, *192 and movies when they traveled to these therapy sessions. John's therapy also was conducted through telephone calls between petitioners, John, and DeSisto staff members. Petitioners placed these telephone calls, at the insistence of DeSisto staff members, to further John's treatment at DeSisto. Failure to place these telephone calls would have resulted in John's dismissal from the program. Petitioners bought new clothing for John to wear at DeSisto. Prior to his enrollment at DeSisto, John had either lost or destroyed most of his clothing as a result of his behavioral and drug problems. The clothing purchased was of the same type worn by other students. Petitioners purchased toiletries and towels for John to use while at DeSisto. Petitioners also bought and gave jewelry to John in recognition of his achievements in the DeSisto program, and to increase his self-esteem. These gifts of jewelry were made at the suggestion of DeSisto staff members. Petitioners joined the Michigan Association for Parents of DeSisto (MAPOD), and provided refreshments for at least one MAPOD function held during 1987. Petitioners also purchased prescription medicine for family members during the *193 taxable year 1987. On their 1987 Federal income tax return, petitioners deducted John's tuition, room, and board at DeSisto as a medical expense under section 213. Petitioners also claimed a medical expense deduction for amounts paid in 1987 for the family's airfare to and from DeSisto; rental car payments, hotel, meal, and movie expenditures made in connection with these trips to DeSisto; telephone expenditures; membership dues in the Michigan Association for Parents of DeSisto (MAPOD); clothing, toiletries, and jewelry purchased for John while at DeSisto; John's allowance while at DeSisto; and family medical prescriptions. Respondent disallowed all of petitioners' medical expense deductions except the amounts paid for John's tuition, room, and board. Container Lease Program Investment
Petitioner made a 1983 tax shelter investment in the Dry Cargo Marine Container Lease program (Container program) offered by the Gold Depository and Loan Company, Inc. (GD&L). Petitioners reported a loss of $ 33,531 from this investment on Schedule C of their 1985 Federal income tax return. Under a closing agreement petitioners entered with respondent, they are not entitled to any deduction *194 for this loss. Prior to investing in the Container program, petitioner made a preliminary investigation to satisfy himself that GD&L was a solid company and that substantial authority existed to support any losses petitioners would claim as a result of his participation in this tax shelter. Petitioner's investigation included his examination of opinion letters concerning investments in the Container program. These opinion letters were issued to GD&L or its subsidiary, Planned Investments, by a reputable accounting firm, a consulting group, and two attorneys. The authors of these opinion letters concluded that, under the investment plan proposed by GD&L, an investor would be entitled to an investment tax credit and depreciation and interest deductions for Federal income tax purposes. The plan, as described in the opinion letters, called for the purchase and lease of general dry cargo containers used in shipping within the United States, or shipping to and from the United States. It also called for 20 percent of the basis of the containers to be at risk without regard to nonrecourse debt, the containers to be purchased from unrelated parties, the debt to finance the containers *195 to be obtained from unrelated parties, at least 15 percent of the gross rentals to be applicable to expenses in the first year without regard to interest and depreciation deductions, and the lease term to be for less than one half the useful life of the containers. Petitioner, as a part of his investigation, also looked at sample leases and other documents supplied to him by GD&L. He had conversations with more than 30 individuals to discuss GD&L and the Container program and their viability. OPINION I. Promotional Expenses
Initially, we must decide whether petitioners are entitled to a deduction under section 162(a) for "promotional" expenses they paid during the taxable years in issue. If petitioners' "promotional" expenses satisfy the requirements of section 162(a), then we must determine the extent to which these deductions are limited by the requirements of section 274. In general, a deduction is allowed for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Sec. 162(a). Whether an expense is ordinary and necessary is determined according to prevailing standards of business conduct. Welch v. Helvering, 290 U.S. 111, 115 (1933). *196 Petitioners believe that their "promotional" expenditures were both appropriate and helpful to the development of Mr. Urbauer's business. They became members of the Club because of petitioner's view that every member of the Club was a potential business client, and his belief that membership would reduce his business advertising costs. Petitioners considered their "promotional" expenditures essential to their efforts to promote Mr. Urbauer's business among the Club membership. Thus, these "promotional" expenditures were necessary business expenses. Welch v. Helvering, supra at 113. Professionals often use social clubs and social events to advance their business discussions and make business contacts. See generally Guggenheimer v. Commissioner, 18 T.C. 81 (1952), affd. 209 F.2d 362 (2d Cir. 1954); Drew v. Commissioner, T.C. Memo. 1972-40; Hussey v. Commissioner, a Memorandum Opinion of this Court dated Feb. 18, 1952. Petitioners' "promotional" expenditures related to their use of the Club to promote Mr. Urbauer's business. As such, these expenditures were ordinary and necessary within the meaning *197 of section 162(a). Respondent contends that section 274 disallows any deduction petitioners might otherwise be entitled to take under section 162(a) for payment of "promotional" expenses. He argues that petitioners have failed to show that their "promotional" expenditures were directly related to, or immediately preceding or following a substantial and bona fide business discussion and associated with the active conduct of Mr. Urbauer's business. Sec. 274(a); sec. 1.274-2(a)(1), Income Tax Regs.
Section 274 provides, in pertinent part, that (a) ENTERTAINMENT, AMUSEMENT, OR RECREATION. -- (1) IN GENERAL. -- No deduction otherwise allowable under this chapter shall be allowed for any item -- (A) ACTIVITY. -- With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or
(B) FACILITY. *198 -- With respect to a facility used in connection with an activity referred to in subparagraph (A). In the case of an item described in subparagraph (A), the deduction shall in no event exceed the portion of such item which meets the requirements of subparagraph (A). (2) SPECIAL RULES. -- For purposes of applying paragraph (1) -- (A) Dues or fees to any social, athletic, or sporting club or organization shall be treated as items with respect to facilities. * * * (C) In the case of a club, paragraph (1)(B) shall apply unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business.
* * * (d) SUBSTANTIATION REQUIRED. -- No deduction shall be allowed -- * * * (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other *199 item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility * * * (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, [or] using the facility * * * [6]
Petitioners contend that payments they made to the Club for "promotional" expenses are deductible because these expenditures are with respect to a facility used in connection with entertainment. See sec. 1.274-2(e)(3), Income Tax Regs. They argue are that these expenditures are comparable to membership dues paid, and therefore are deductible to the extent that such dues are deductible. [7] Sec. 274(a); sec. 1.274-2(e)(4), Income Tax Regs.
*200 Section 1.274-2(e)(3), Income Tax Regs., provides that The phrase "expenditures with respect to a facility used in connection with entertainment" includes depreciation and operating costs * * * (ii) Club dues. Dues or fees paid to any social, athletic, or sporting club or organization are considered expenditures with respect to a facility used in connection with entertainment. * * * [Emphasis added.] (iii) Expenditures not with respect to a facility. The following expenditures shall not be considered to constitute expenditures with respect to a facility used in connection with entertainment -- (a) Out of pocket expenditures. Expenses (exclusive of operating costs * * *) incurred at the time of an entertainment activity * * *
Petitioners participated in golf tournaments and bowling leagues that the Club regularly sponsored. They paid entry fees, in addition to their membership dues, to participate in these tournaments and leagues. These entry fees compensate the Club for bowling alley rentals, golf course maintenance, and labor costs associated with these activities. As such, these entry fees are operating costs and constitute fees paid with respect to a *201 facility used in connection with entertainment. Sec. 1.274-2(e)(3), Income Tax Regs. Accordingly, we hold that for taxable years 1985, 1986, and 1987 petitioners are entitled to deduct 84 percent, 93 percent, and 93 percent, respectively, of their payments for golf tournaments and bowling league entry fees. The Club charged petitioners, and other Club members, fees for golf club storage and "hole-in-one" awards. These fees were periodic charges that petitioners paid regardless of how often they used the Club facilities. These fees amount to a surcharge on petitioners' membership dues, and, therefore, are expenditures with respect to a facility used in connection with entertainment. Sec. 1.274-2(e)(3)(ii), Income Tax Regs. We hold that petitioners are entitled to deduct 84 percent, 93 percent, and 93 percent of these fees that they paid during each of the respective taxable years. Petitioners also paid the Club an annual fee for the Club magazine. This fee was in addition to payments that Mr. Urbauer made for advertising in the Club magazine. The annual fee was assessed against petitioners irrespective of their use of the magazine, and also amounts to a surcharge on petitioners' *202 membership dues. Accordingly, petitioners are entitled to deduct 84 percent, 93 percent, and 93 percent of the annual fee they paid for the Club magazine for each of the respective taxable years at issue. Sec. 1.274-2(e)(3)(ii), Income Tax Regs.
Petitioners also paid the Club for miscellaneous debits charged to their Club account during the taxable years at issue. These miscellaneous debits are out-of-pocket expenditures relating to small expenses, such as bag handling fees, that petitioners incurred while at the Club. These expenses do not constitute Club operating costs, and, therefore, are not considered expenditures with respect to a facility used in connection with entertainment. Sec. 1.274-2(e)(3)(iii)(a), Income Tax Regs.
Petitioners failed to substantiate that their expenditures for miscellaneous debits were directly related to, or immediately preceding or following, substantive and bona fide business discussions. They provided no evidence to corroborate their own testimony that the miscellaneous debits petitioner labeled as "promotional" were expenditures for a business purpose. Petitioners were unable to identify the individuals entertained, provide more than a *203 general characterization of any related business discussions, or otherwise support their contention that there was more than a general expectation of deriving some business with respect to these expenditures. They failed to explain why Mr. Urbauer labeled some miscellaneous debits shown on their member's statements with the names of the individuals entertained, but failed to provide similar information next to these charges. Accordingly, petitioners are not entitled to a deduction for miscellaneous expenditures. Sec. 274(a), (d); secs. 1.274-2(a)(2), 1.274-5(b)(3), (c)(2), Income Tax Regs.
II. Charitable Contributions
Section 170(a) generally allows a deduction for charitable contributions made during the taxable year. A charitable contribution is the voluntary transfer of property without adequate consideration. United States v. American Bar Endowment, 477 U.S. 105, 118 (1986); Murphy v. Commissioner, 54 T.C. 249, 252 (1970). Payments to a qualified charitable organization are deductible as charitable contributions to the extent that they exceed the fair market value of any material benefit received in return. United States v. American Bar Endowment, supra at 118; *204 Murphy v. Commissioner, supra at 253; Rev. Rul. 67-246, 1967-2 C.B. 104. Petitioners bear the burden of proof of whether their payments to qualified charitable organizations are deductible as charitable contributions. Rule 142(a). In 1986, petitioners purchased five tickets at $ 3.50 each to a benefit concert given by their daughter's high school musical group, the Mercyaires. They argue that they are entitled to a charitable deduction equal to their cost for the tickets because they did not attend the concert, and therefore, they received no material benefit from this purchase. We do not agree; Rev. Rul. 67-246, 1967-2 C.B. at 106, correctly states that the mere fact that tickets or other privileges are not utilized does not entitle the patron to any greater charitable contribution deduction than would otherwise be allowable. The test of deductibility is not whether the right to admission or privileges is exercised but whether the right was accepted or rejected by the taxpayer. If a patron desires to support an affair, but does not intend to use the tickets * * * he can make an outright gift *205 of the amount he wishes to contribute, in which event he would not accept or keep any ticket * * *.
Petitioners' acceptance of the tickets created an expectation that they would attend the concert and assert their right to be seated for the performance, and the Mercyaires, therefore, were obligated to prepare for petitioners' attendance. Consequently, petitioners received material benefit merely by having the right to decide whether to attend the concert. Petitioners have not shown that their purchase of the concert tickets exceeded the fair market value of the benefit they received. They did not provide any evidence as to the fair market value of a ticket to a high school glee club concert or the quality of the Mercyaires' performance. On this record, we cannot say that $ 3.50 was not the fair market value of a ticket to the Mercyaires benefit concert. Petitioners also paid $ 60 in 1986 for five tickets to the Mercyaires' yearend spaghetti banquet. The banquet served as a fund-raiser for the Mercyaires, and it was held in the school cafeteria and catered by the Mercyaires and their parents. Petitioners provided credible testimony that the fair market value of the banquet *206 was between $ 2.50 and $ 5.00 per ticket. Mr. Urbauer also stated that the difference between the ticket price and the amount paid "was just a donation to the school." We find that the fair market value for the banquet was $ 5 per ticket, or $ 25 total, and that petitioners are entitled to a charitable deduction of $ 35 for the spaghetti banquet. Petitioners made several expenditures in connection with the 1986 Detroit High School auction. These expenditures included the proceeds from two $ 10 checks used by the auction committee, $ 105 for items petitioners declined to accept and auctioned the next day, and $ 120 for the purchase of airline tickets the Detroit High School later sold at auction. Petitioners were under no compulsion to make any of these expenditures, and they did not accept any material benefit in return for these expenditures. Accordingly, these expenditures are outright gifts, and petitioners are entitled to a charitable deduction of $ 245 as a result of these contributions. Mr. Urbauer also wrote a check in the amount of $ 430 to the Detroit High School during the auction. Petitioners presented no evidence that they did not receive a material benefit in return *207 of this payment, and they admit that Mr. Urbauer was bidding during the auction. Mrs. Urbauer testified that "$ 430 is a lot of money. I don't know what that was, but that might have been something we bid on ourselves." Consequently, petitioners have not shown that this $ 430 payment was a voluntary transfer without adequate consideration, and, therefore, they are not entitled to a charitable contribution deduction in connection with this payment. Petitioners received unclaimed auction items in return of Mrs. Urbauer's $ 50 payment to the Detroit High School on December 9, 1986. Petitioners do not remember what they received, nor do they remember the quantity or quality of these items. On this record we are unable to determine the material benefit, if any, that petitioners received. Consequently, we sustain respondent's determination that petitioners are not entitled to a charitable deduction in connection with this $ 50 payment. No evidence was presented to support petitioners' claim that they did not receive a material benefit in return of their $ 47.24 payment to Cranbrook Middle School. Mrs. Urbauer testified that this payment resulted from a neighbor's fundraising solicitation. *208 Petitioners were unclear as to whether the fundraiser was a walk-a-thon or a "sales" event, and unable to say whether they received a material benefit in return for this payment. Thus, petitioners are not entitled to the claimed deduction. Petitioners made charitable contributions of property to the Furniture Resource Center and the Saint Vincent Depaul Society during the taxable year 1986. Where a charitable contribution is made in property other than money, the regulations allow a deduction equal to the fair market value of the property at the time of contribution. Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); sec. 1.170-A-1(c)(1), Income Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; McGuire v. Commissioner, 44 T.C. 801, 806 (1965). This Court has stated that "[fair market] value is a question of fact to be resolved upon a consideration of all *209 the evidence." Estate of DeBie v. Commissioner, 56 T.C. 876, 894 (1971). (Citation omitted.) Petitioners provided credible testimony of the relative quality and condition of the property they donated to each organization. However, we cannot say that petitioners' testimony as to the relative quality and condition of the donated property is sufficient to establish its fair market value in the full amounts claimed by them. Petitioners failed to substantiate Mrs. Urbauer's testimony that had they decided to sell the property they would have received a price in excess of the fair market value they claimed as a deduction. Petitioners also failed to provide evidence as to the sales value of property of the same character and condition. In short, Mr. Urbauer acknowledged petitioners' inability to establish an exact fair market value for the donated property, stating that "respondent is not right with regard to the value [of the donated property], and I am not right." Taking all the evidence into consideration, we find that the fair market value of the donated property was $ 4,000. See Zmuda v. Commissioner, supra at 726. III. Medical *210 Expenses
Section 213(a) allows a deduction for expenses paid, and not otherwise compensated, for medical care of the taxpayer, the taxpayer's spouse, or a dependent to the extent that these expenses exceed 7.5 percent of the taxpayer's adjusted gross income. The medical care deduction permitted by section 213 is an exception to the general rule of section 262 that a taxpayer is not entitled to a deduction for personal, living, or family expenses. Gerstacker v. Commissioner, 414 F.2d 448, 450 (6th Cir. 1969). A taxpayer is entitled to a deduction under section 213 only where the expenditure is proximately related to his medical care, and not merely connected with his medical care. Gerstacker v. Commissioner, supra at 450; Carlisle v. Commissioner, 37 T.C. 424, 428 (1961); Havey v. Commissioner, 12 T.C. 409, 412 (1949). The term "medical care" is defined by the statute as "amounts paid * * * for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body, * * * [and] for transportation primarily for and essential *211 to medical care". Sec. 213(d)(1). Whether an expenditure constitutes medical care depends upon the therapeutic nature to the individual, and not whether the expense is "medical" to all persons. Fischer v. Commissioner, 50 T.C. 164, 174 (1968). However, expenses merely beneficial to an individual's general health are not expenditures for medical care. Sec. 1.213-1(e)(1)(ii), Income Tax Regs.
Respondent contends that petitioners' disallowed medical expenses do not constitute amounts paid for medical care. Respondent argues that DeSisto did not render medical care to John, and that the disallowed expenditures were not primarily for the alleviation of John's behavioral and drug problems. Petitioners contend that they enrolled John in DeSisto primarily to treat his behavioral and drug problems. They argue that treatment of John's behavioral and drug problems constitutes medical care under the regulations, and that the disallowed expenditures were necessary to John's treatment. We reject respondent's argument that DeSisto did not render medical care to John. Respondent has not challenged petitioners' deduction of payments made to DeSisto for John's tuition, *212 room, and board. Section 1.213-1(e)(1)(v), Income Tax Regs., provides that a taxpayer is entitled to a medical care deduction for ordinary costs of education only where the availability of medical care is a principal reason for his presence at the school, and the expenses are incidental to the special services provided by the school. Atkinson v. Commissioner, 44 T.C. 39, 51 (1965). By application of this regulation, we conclude that John attended DeSisto to receive medical care, and that DeSisto provided such care. Parents of DeSisto students were required to maintain a "personal account" and a "allowance account", in addition to the other amounts they paid DeSisto. Petitioners' failure to maintain these accounts would have prompted John's dismissal from DeSisto. Because of this requirement, petitioners' expenses for John's "personal account" and "allowance account" at DeSisto were ordinary costs of education and incidental to the special services DeSisto provides. Thus, petitioners are entitled to a deduction of these costs. Sec. 1.213-1(e)(1)(v), Income Tax Regs.
It is obvious that therapy sessions were integral to John's treatment at DeSisto. The *213 decision by DeSisto to require petitioners' participation in these therapy sessions presupposes that such participation was essential to John's treatment. As such, petitioners' participation in these therapy sessions was therapeutic and an integral part of John's medical care. Petitioners' participation in John's treatment required their attendance at some therapy sessions. To attend these sessions, they incurred costs for airfare and rental cars. On the record, it is obvious that the only reason petitioners traveled to and from DeSisto was to attend and participate in John's therapy sessions. Accordingly, petitioners' transportation was primarily for and essential to medical care, and they are entitled to deduct these costs. Sec. 213(d)(1). John's therapy was also conducted by telephone calls between petitioners, John, and DeSisto staff. We believe that DeSisto staff would not have required petitioners' participation in these telephone calls if their participation was not necessary to John's treatment. Thus, petitioners' participation in these calls was proximately related to John's medical care, and their telephone expenses are therefore deductible under section 213. Section *214 213(d)(2) provides that amounts paid for lodging while away from home, not lavish or extravagant, may only be deducted if the medical care is provided by a physician in a licensed hospital or medical care facility. In contrast to other parts of section 213, the language of section 213(d)(2) is unambiguous in limiting the deduction for lodging to those circumstances where the medical care is provided by a physician in a licensed hospital or medical care facility. Sec. 213(d)(2); Polyak v. Commissioner, 94 T.C. 337, 344-345 (1990). Petitioners failed to substantiate whether John's therapy sessions were conducted by a therapist or by a psychiatrist. Because a therapist need not be a physician, petitioners have not satisfied the requirements of section 213(d)(2), and are not entitled to deduct their away-from-home lodging expenses incurred by reason of John's treatment at DeSisto. It is well settled that no medical expense deduction is allowed for meal expenses incurred while away from home for medical care. Bilder v. Commissioner, 369 U.S. 499 (1962); Carasso v. Commissioner, 292 F.2d 367 (2d Cir. 1961), affg. 34 T.C. 1139 (1960); *215 Rose v. Commissioner, 52 T.C. 521 (1969), affd. 435 F.2d 149 (5th Cir. 1970). Accordingly, petitioners are not allowed a deduction for meal expenses they incurred while they were away from home for the purpose of attending John's therapy sessions at DeSisto. We also reject petitioners' claim that expenditures for clothing, toiletries, towels, MAPOD, and movies constitute medical expenses. Although these expenditures were in connection with John's stay at DeSisto, petitioners provided no evidence that these expenditures were proximately related to John's medical care. Petitioners' motive in making these expenditures amounted to no more than their concern for John's general health. These expenditures were not therapeutic or essential either to John's enrollment or treatment at DeSisto. We have stated that "it is obvious that many expenses are so personal in nature that they may only in rare situations lose their identity as ordinary personal expenses and acquire deductibility as amounts claimed primarily for * * * [medical care]." Stringham v. Commissioner, 12 T.C. 580, 584 (1949), affd. 183 F.2d 579 (6th Cir. 1950). *216 This is not such a rare situation. Petitioners also claimed a deduction of $ 879 for amounts paid for prescriptions during the taxable year 1987. Mr. Urbauer testified that petitioners bought prescription medicines during 1987, although he did admit that one-half to three-quarters of the $ 879 was spent to purchase toiletries for John during his stay at DeSisto. As we have previously stated, petitioners are not entitled to a medical deduction for amounts paid for John's toiletries. However, we are convinced that petitioners incurred expenses in the amount of $ 220 for prescription medicines. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). IV. Sec. 6661 Additions
Section 6661(a) provides an addition to tax where an underpayment of income tax is attributable to a substantial understatement of income tax. An understatement of income tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). Where an understatement is attributable to a tax shelter, the amount of the understatement is to be reduced by any portion for which there is or was substantial authority for the taxpayer's *217 Federal tax treatment of the item and the taxpayer reasonably believed that his position was more likely than not the proper tax treatment. Sec. 6661(b)(2). Substantial authority exists only where the weight of authority supporting the Federal tax treatment is substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs.Substantial authority refers to applicable Internal Revenue Code provisions, other statutory provisions, revenue rulings, court cases, and other legal or regulatory precedents. Sec. 1.6661-3(b)(2), Income Tax Regs. The weight of authorities depends on their persuasiveness and relevance to the pertinent facts. Sec. 1.6661-3(b)(3), Income Tax Regs.
As to whether substantial authority existed for petitioners' Federal tax treatment of Mr. Urbauer's investment in the GD&L Container program, petitioners provided no evidence on the structure of petitioner's investment in the program. They did not provide an offering memorandum because, according to petitioner, "that's not * * * the crux of this whole issue". However, without an offering memorandum or other evidence of the nature and terms of petitioner's *218 actual investment, the record before us lacks pertinent facts establishing that the authority supporting petitioners' Federal tax treatment of this investment was substantial. If the Rule 155 computation reveals that petitioners substantially understated their 1985 tax liability, respondent's determination of an addition to tax under section 6661 will be sustained. V. Sec. 6653(a) Additions
Section 6653(a) provides an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do in a similar situation. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of proving that the addition to tax under section 6653(a) does not apply. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). Petitioners have provided no evidence to show that their underpayment is not due to negligence or intentional disregard of the rules. To the contrary, Mr. Urbauer admitted that periodic charges, such as golf club storage fees, "are an extension of the dues", and that he "probably *219 should have deducted [from their claimed deduction] the personal portion of those, which I didn't do." A reasonable and ordinarily prudent person would have limited his deduction of these fees to those related to business. Accordingly, respondent's determination of section 6653(a) additions to tax for the taxable years 1986 and 1987 is sustained. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. Pursuant to sec. 7429(b)(2)(B), we only have jurisdiction over those jeopardy levies and assessments made on or after July 1, 1989, and relating to 1 or more taxes or taxable years before this Court.↩
2. As evidenced by the downward trend in the gross receipts of Mr. Urbauer's business for the taxable years at issue: ↩
1985
$ 170,283
1986
$ 137,559
1987
$  92,117
3. Mr. Urbauer attended college on a golf scholarship and his handicap was between 8 and 12 during the taxable years at issue. Mrs. Urbauer won the Most Improved Golfer award at the Detroit Golf Club 2 years in a row, and lowered her handicap from the 40's to the low 20's during the taxable years at issue.↩
4. The Detroit Golf Club gave a cash award to a golfer scoring a hole-in-one at the Club. Typically the award is used to purchase a round of drinks for members in the Club's lounge.↩
5. The Furniture Resource Center is a charitable organization that provides furniture to individuals who have been displaced because of fire, domestic violence, or other misfortune.↩
6. Sec. 274(d) as in effect for the taxable year 1985. Amendments to sec. 274(d) in effect for the taxable years 1986 and 1987 are not material to the issue before the Court.↩
7. The parties agree that petitioners used the Club primarily to further Mr. Urbauer's business, and that, under secs. 162(a) and 274, petitioners are entitled to deduct 84 percent, 93 percent, and 93 percent of the membership dues they paid to the Club in each of the respective taxable years 1985, 1986, and 1987.↩