George S. MAUERMAN, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 93–9009.

United States Court of Appeals, Tenth Circuit.

April 25, 1994.

William E. Farrior of Barrow, Gaddis, Griffith & Grimm, Tulsa, OK, for appellant.

Janet A. Bradley (Michael L. Paup, Acting Asst. Atty. Gen., and Ann B. Durney, Tax Division, Dept. of Justice, with her on the brief), Washington, DC, for appellee.

Before KELLY, Circuit Judge, BARRETT, Senior Circuit Judge, and THEIS *, Senior District Judge.

BARRETT, Senior Circuit Judge.

George S. Mauerman (Mauerman/Petitioner) appeals from a tax court decision upholding a penalty for substantial understatement of tax under 26 U.S.C. § 6661(c) for calendar years 1984 and 1986 imposed by the Commissioner of Internal Revenue (Commissioner).

*Factual Background*

Because Mauerman does not challenge the tax court's Findings of Fact, we fully adopt them. The tax court found in relevant part:

Petitioner obtained an undergraduate degree from Vanderbilt University in 1959 and a medical degree from Columbia Medical School in 1963. Petitioner stayed at Columbia Medical School until 1965 and then spent 2 years in military service, until 1967. From 1967 to 1970, petitioner participated in an orthopedic fellowship in Memphis, Tennessee. Since 1970 petitioner has practiced orthopedic surgery and sports medicine in Tulsa, Oklahoma. He is part of a group of eight orthopedic surgeons and two sports medicine doctors. The predominant source of petitioner's gross income for the years in issue was wages and salaries. On his 1984 tax return petitioner showed his occupation as "Surgeon". Petitioner had investments in stock, and investments through partnerships and corporations. Petitioner does not have any legal, tax, or insurance expertise.

．　　　．　　　．　　　．　　　．

The understatements on which the section 6661 additions are based are due to

---

* The Honorable Frank G. Theis, Senior Judge, United States District Court for the District of Kansas, sitting by designation.

petitioner's deductions of payments to Pre–Paid Legal Services, Inc. (hereinafter sometimes referred to as Pre–Paid), which payments should have been capitalized (footnote omitted).

Pre–Paid began business in 1973 and was one of the first companies of its type to provide prepaid legal service benefits. Pre–Paid's primary business was the issuance of legal service contracts to its individual members in return for monthly premiums. The legal service contract sold by Pre–Paid provided for the payment of specified legal fees incurred by the individual member. By 1984, Pre–Paid was marketing legal service contracts in 22 States and was a publicly held company listed on the NASDAQ National Market System. Pre–Paid also began a program whereby an individual could become a reinsurer.

Reinsurance is a common business practice for many insurance companies. Basically, it is a contract whereby risk is transferred between two parties. The parties to the contract are the ceding company (reinsured) which wrote the original policy, and the assuming party (reinsurer) which pays a ceding commission and accepts the business risks and rewards of the insurance (claims and premium income). In indemnity reinsurance, liability remains the direct responsibility of the ceding company and the policyholder is not notified of the reinsurance transaction.

Pre–Paid established a pooling agreement which all of the investors and reinsurers were obliged to sign whereby each individual participant in this reinsurance program pooled his contracts that he had purchased into one large pool to be managed and overseen by L.N. Fentem Management Co. (hereinafter sometimes referred to as Fentem Management), where Fentem Management would administer, report, and distribute claims experience among the individual reinsurers.

Petitioner became aware of Pre–Paid in about 1976 or 1977 through an attorney who was a patient of petitioner. Petitioner bought stock in Pre–Paid in 1977, and continued to buy stock for himself and his family through 1986. During this time,

petitioner invested more than half a million dollars in Pre–Paid stock. In 1983 petitioner learned about Pre–Paid's reinsurance program. Before deciding to become involved with the reinsurance program, petitioner confirmed that Harland Stonecipher ..., Pre–Paid's president, Rick Haney ..., Pre–Paid's vice president, and Frank Jaques (hereinafter sometimes referred to as Jaques) were putting their own money into Pre–Paid's reinsurance program. Jaques led petitioner to believe that this type of reinsurance program "had already been cleared through the courts" and was "all up-and-up". Petitioner knew that Jaques had the second largest shareholdings in Pre–Paid at that time, that Jaques was legal counsel for Pre–Paid, and that Jaques was on the board of directors of Pre–Paid. Petitioner was told that Fentem Management had researched the reinsurance program, and that an accounting firm, Fentem, Quinten & Thomas, Inc. (hereinafter sometimes referred to as Fentem CPAs), was also involved in the reinsurance program. Jaques, Fentem Management, and Fentem CPAs told petitioner that the payments were currently deductible.

Petitioner made payments to Pre–Paid as investments in the reinsurance program in 1983, 1984, and 1986; he did not make such payments in 1985 because he did not have enough free cash.

In December 1984, petitioner entered into a written contract with Pre–Paid. By the terms of the contract, petitioner would make cash payments to Pre–Paid and indemnify Pre–Paid for administrative expenses and claims under certain prepaid legal insurance contracts issued by Pre–Paid.... Pre–Paid also agreed to administer the memberships for an administrative fee not to exceed 30 percent of the gross premium income. Pre–Paid guaranteed a certain amount of gross premium income each year to petitioner, and agreed to replace canceled memberships subject to the payment of a replacement fee. The transaction provided Pre–Paid with additional cash reserves to be used in the expansion of its business.

Petitioner entered into similar contracts with Pre–Paid in 1983 and 1986. The 1983 transaction generated $45,000 in gross premiums for 1984, which was reported on Schedule C of petitioner's 1984 tax return.

Petitioner also entered into an agreement (effective January 1, 1984) with Fentem Management. The agreement provides that all revenues and operating expenses attributable to the reinsurance program pooling agreements are to be pooled and any profits or losses are to be distributed. Pursuant to the agreement, Fentem Management would hire C.P.A.'s and attorneys to perform accounting and legal services that would be needed to manage the reinsurance program.

Petitioner received a letter regarding the reinsurance transaction, dated February 28, 1985, from Fentem CPA's stating that "It is our opinion that each individual should report their income and expenses on Schedule 'C' of the 1040". The letter also states: "However, this may not be the correct method for all investors and we suggest that they contact with [sic] their own accountant or tax preparer for the method most suitable to their situation."

Petitioner received a copy of a letter dated March 6, 1985, to Fentem Management from Jaques, who was also the attorney for Fentem Management, stating that "all activities of the pool, [Pre–Paid], and [Fentem Management] during the year 1984 have been legal and proper". Neither of the above-mentioned letters cites any legal authority.

Since about 1970, petitioner had used Don Atkins, an attorney and C.P.A., to prepare or review petitioner's tax returns. Don Atkins prepared petitioner's tax returns for the years in issue. Don Atkins' son, Blake Atkins, did the primary work in preparing these tax returns; Blake Atkins did so as Don Atkins' employee. Blake Atkins has a degree in accounting from Wake Forest University, and a law degree from the University of Tulsa. Blake Atkins began practicing tax and corporate law in 1981.

Neither Don Atkins nor Blake Atkins was an investor in or officer of Pre–Paid. When Blake Atkins received information from petitioner for preparation of petitioner's 1983 tax return,[1] Blake Atkins was not aware of what the reinsurance transaction was. Blake Atkins called petitioner for more information. Petitioner briefly reviewed the reinsurance program, and directed Blake Atkins to call Fentem CPAs to see if the reinsurance program "was on the up-and-up". Blake Atkins discussed the reinsurance program over the telephone with an accountant from Fentem CPAs. Fentem Management sent to Blake Atkins the material which had been prepared by Jaques. Blake Atkins reviewed the information, but he did not do any independent research. Blake Atkins confirmed some of the information by looking at the Internal Revenue Code and the Treasury regulations. Blake Atkins read the synopses of cases sent to him from Fentem Management, but he did not read the case opinions. Blake Atkins noted that appellate courts were not in agreement as to whether these types of payments were currently deductible or whether they should be amortized, but he decided there were "sufficient grounds" that the payments were currently deductible. Blake Atkins did not do any legal research other than to verify the information which was sent to him by Fentem Management. Blake Atkins knew that Jaques' holdings in Pre–Paid were the second largest, that Jaques was an officer in Pre–Paid, and that Jaques was legal counsel for Pre–Paid. Blake Atkins did not explain to petitioner the legal basis for treating the payments as currently deductible, nor did he explain to petitioner that appellate courts disagreed about the proper tax treatment. In regard to the reinsurance program, petitioner relied both on the advice of his attorneys, Don Atkins and Blake Atkins, and on Fentem Management and Jaques. Petitioner knew that Don Atkins and Blake Atkins were advising him

---

1. Petitioner first invested in Pre–Paid's reinsurance pool in 1983. His 1984 tax return shows tax effects of his 1983 investment as well as his 1984 investment (footnote in original).

based on information provided to them by Jaques and Fentem Management.

.    .    .    .    .

[The Commissioner] disallowed petitioner's claimed deductions for his payments to Pre–Paid on petitioner's 1984 and 1986 tax returns. The dispute was settled by allowing the payments in both 1984 and 1986 to be amortized over the 5–year terms of the contracts.

On his 1984 tax return, petitioner shows a tax liability of $28,628.71; his correct liability is $73,267. On his 1986 tax return, petitioner shows a tax liability of $15,123.05; his correct liability is $56,726.

Petitioner asked [the Commissioner] to waive all or part of the substantial understatement additions to tax pursuant to section 6661(c) for 1984 and 1986. [The Commissioner] refused to waive any of the substantial understatement additions to tax.

(R., Vol. I, Doc. 15 at 3–12).

Based on the findings of fact, the tax court concluded, in part, that:

1. *Held:* Petitioner did not have substantial authority for the position taken on his tax returns.

2. *Held, further:* Petitioner did not adequately disclose his position on his tax returns.

3. *Held, further:* [The Commissioner] did not abuse her discretion in failing to waive the additions to tax.

(*Id.* at 1).

### Issue

The sole issue on appeal is whether the Commissioner abused her discretion in failing to waive the penalty for substantial understatement of tax under I.R.C. § 6661(c).

### Procedural History

The Commissioner determined that Mauerman was responsible for additions to tax under I.R.C. § 6661(c) of $11,160 for 1984 and $10,401 for 1986. Following the determination, Mauerman filed a protest and requested a waiver of the penalty which was summarily denied.

On appeal, the tax court held that the Commissioner had not abused her discretion in failing to waive the additions to tax penalty. The tax court concluded that Mauerman had failed to prove, pursuant to 26 C.F.R. § 1.6661–6(b), that the factors showing reasonable cause and good faith were so clear that the Commissioner's decision was arbitrary, capricious, and without sound basis in fact.

### Discussion

■ We review the Commissioner's decision under § 6661 for abuse of discretion. *Karr v. Commissioner,* 924 F.2d 1018, 1024 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 992, 117 L.Ed.2d 153 (1992); *Mailman v. Commissioner,* 91 T.C. 1079, 1084, 1988 WL 133255 (1988).

■ The Commissioner contends that if the taxpayer demonstrates, pursuant to § 6661(c), that there was reasonable cause for the understatement and that he acted in good faith, the Commissioner *may,* but need not, waive all or any part of this addition to tax. The Commissioner states that Mauerman's sophistication as an investor and his reliance on persons with a direct or indirect financial interest in Pre–Paid argue against a showing of reasonable cause and good faith and, therefore, the Commissioner did not abuse her discretion.

Mauerman contends that, under the particular facts and circumstances of this case, he had reasonable cause and good faith and that the Commissioner should have waived the penalty. He states that he made an effort to assess his proper tax liability by giving his disinterested tax attorneys, who were also accountants, all of the information he had. Mauerman further states that the facts show that he did not direct his tax advisors to limit their research in any way and that he reasonably relied on these independent advisors. Moreover, Mauerman argues that he had an honest misunderstanding as to the facts or the law which was reasonable in light of his experience, knowledge, and education. We agree.

I.R.C. § 6661 (Repealed 1989).[2] Substantial understatement of liability, provides in pertinent part:

(c) AUTHORITY TO WAIVE.—The Secretary may waive all or any part of the addition to tax proved by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

26 C.F.R. § 1.6661–6(b) provides in pertinent part:

Reasonable cause and good faith. In making a determination regarding waiver of the penalty under section 6661, the most important factor ... will be the extent of the taxpayer's effort to assess the taxpayer's proper tax liability under the law. For example, reliance on a position contained in a proposed regulation would ordinarily constitute reasonable cause and good faith. In addition, circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer.... Reliance on an information return or on the advice of a professional (such as an appraiser, an attorney, or an accountant) would not necessarily constitute a showing of reasonable cause and good faith. Similarly, reliance on facts that, unknown to the taxpayer, are incorrect would not necessarily constitute a showing of reasonable cause and good faith. Reliance on an information return, professional advice, or other facts, however, would constitute a showing of reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith....

As a result of Pre–Paid's reinsurance investment, other taxpayers had substantial understatement of liability penalties imposed upon them by the Commissioner. *See, e.g., Fisher v. Commissioner,* 64 T.C.M. (CCH) 1670, 1992 WL 386282 (1992); *Estate of Baxter v. Commissioner,* 63 T.C.M. (CCH) 1706, 1992 WL 185 (1992); *Krizer v. Commissioner,* 62 T.C.M. (CCH) 1598, 1991 WL 271596 (1991). In each of these cases, based on the facts presented, the tax court upheld the Commissioner's decision.

In *Fisher,* the petitioners/spouses were employed as a cardiovascular surgeon and a secretary—neither of whom was a tax professional. *Fisher,* 64 T.C.M. (CCH) 1670. Petitioners relied on and had a long-standing relationship with their attorney and their accountant. *Id.* Petitioners also were sophisticated investors who had previously invested in Pre–Paid's stock prior to investing in Pre–Paid's reinsurance program. *Id.* Most significantly, however, was the fact that Jaques was Fishers' attorney and Thomas of Fentem CPAs was Fishers' accountant. *Id.*

In *Fisher,* the tax court stated:

... Clearly, Jaques and Thomas were not in a position to offer independent, unbiased tax advice about Pre–Paid's plan to petitioners. As general counsel to Pre–Paid and a member of Pre–Paid's board of directors, Jaques had fiduciary obligations to Pre–Paid that were inconsistent with his obligations to petitioners. Whatever may have been the appropriateness of Jaques' other investment advice to petitioners, Jaques' advice to petitioners about Pre–Paid's reinsurance arrangement had to be clouded by his obligations to Pre–Paid. Thomas was not independent of Jaques and Pre–Paid.

Fisher's obvious intelligence and extensive investment experience should have caused him to realize that he could not insulate himself from tax harm by relying on Jaques and Fentem with regard to their tax advice.... *Id.*

By the same token, in *Krizer* and *Baxter,* the petitioners were again clients of Jaques, who had advised them to take current deduc-

---

**2.** Sections 6662–64 of the Internal Revenue Code now govern the imposition of accuracy-related or fraud penalties. Section 6664, Definitions and Special Rules, provides, in pertinent part:

(c) *Reasonable cause exception.—*

(1) *In general.*—No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

tions for payments to Pre–Paid's reinsurance pooling program. *Krizer*, 62 T.C.M. (CCH) 1598; *Baxter*, 63 T.C.M. (CCH) 1706. In *Krizer*, the tax court stated:

> Petitioners presented no evidence of the facts surrounding their reliance on professional advice other than Mr. Jaques' testimony.... The record is silent as to what advice, if any, petitioners received from the certified public accountant who in fact prepared their return.

> [The Commissioner] contends that petitioners' reliance on Mr. Jaques could not constitute reasonable cause or good faith by petitioners because, as the second largest shareholder of Pre–Paid Legal, Mr. Jaques stood to profit from the transaction petitioners entered into with Pre–Paid Legal, a fact that [the Commissioner] asserts 'was undoubtedly known to petitioners.' ...

> Essentially, [the Commissioner] argues that Mr. Jaques was not an independent adviser under these circumstances, and, therefore, in considering petitioners' request for waiver of the addition to tax, petitioners' reliance on his advice was deemed inadequate to establish reasonable cause and good faith. On this record, the Court does not find respondent's decision not to waive the addition to tax to be an abuse of discretion.

*Krizer*, 62 T.C.M. (CCH) 1598.

Our case is distinguishable. Here, though Jaques, Fentem Management, and Fentem CPAs are involved, Mauerman used his own, independent, attorneys and accountants, Don Atkins and Blake Atkins, to advise him and prepare his return. Mauerman had a long-standing professional relationship with Don Atkins, who was both an attorney and a CPA. Don Atkins's employee, Blake Atkins, though not a CPA, was an attorney with an accounting degree. The Atkins had satisfied themselves that the deduction was proper. Mauerman had reasonable cause, because of the Atkins' expertise, to trust their advice. Moreover, the tax dispute here involved the timing of the deduction, not whether the deduction should be completely disallowed.

Mauerman was not trained in tax law. Though he had been an investor for over ten years, it is not reasonable to expect that Mauerman could monitor his independent advisors to make sure they had done sufficient research to give knowledgeable advice. It is for exactly this reason that many intelligent investors hire independent, educated experts to advise them. Moreover, Mauerman did not attempt to limit the scope of his advisors' research. Therefore, we hold that Mauerman acted in good faith under these circumstances in relying on his independent advisors. *See Vorsheck v. Commissioner*, 933 F.2d 757, 759 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 591, 116 L.Ed.2d 615 (1991); *Heasley v. Commissioner*, 902 F.2d 380, 385 (5th Cir.1990). *See also United States v. Boyle*, 469 U.S. 241, 250, 105 S.Ct. 687, 692, 83 L.Ed.2d 622 (1985) (" '[R]easonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken").

We **REVERSE** the tax court's decision upholding the Commissioner's assessment of a penalty pursuant to § 6661.