Samuel ANDERSON and Mary Anderson, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 94–9007.

United States Court of Appeals, Tenth Circuit.

Aug. 4, 1995.

---

Arnold C. Wegher, Denver, CO, for petitioners-appellants.

Kenneth W. Rosenberg (Loretta C. Argrett, Charles E. Brookhart and Marion E.M. Erickson on the brief), of the U.S. Dept. of Justice, Tax Div., Washington DC, for respondent-appellee.

Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and JENKINS, Senior District Judge.*

JENKINS, Senior District Judge.

Taxpayers Samuel and Mary Anderson appeal the Tax Court's decision in *Anderson v. Commissioner*, 66 T.C.M. (CCH) 1677, 1993 WL 525717 (1993), which found the Andersons liable for additions to tax and increased interest for tax years 1981–84 as a result of Mr. Anderson's investment in a nonexistent container business. We have jurisdiction under I.R.C. § 7482(a)(1) and affirm.

## I. FACTS

Mr. Anderson is an attorney. On December 23, 1983, he entered into a container purchase and lease agreement with Gold Depository & Loan Co., Inc. (GD & L).[1] GD & L purported to sell Mr. Anderson fifty-six marine dry cargo containers for $124,500. Marine dry cargo containers are used to transport dry cargo from one port to another on ocean-going vessels. The agreement called for a down payment of $6,225 (5 percent of the purchase price) with the balance ($118,275) financed at 11 percent interest through a GD & L-related company. The agreement required interest-only payments for five years, with the principal due at the end of the five years. Mr. Anderson was to pay $18,675 a year into a sinking fund, which would reduce the principal at the end of the five years to $24,900. Mr. Anderson was to be personally liable for only $19,920 of this

---

\* The Honorable Bruce S. Jenkins, Senior District Judge, United States District Court for the District of Utah, sitting by designation.

1. Apparently Mrs. Anderson is a homemaker. She did not invest in GD & L but is a party to

amount.[2] The balance of the loan was nonrecourse, secured only by the containers. Mr. Anderson never signed a note or other instrument evidencing the indebtedness, never signed a security agreement and never made any payments toward the indebtedness, even after receiving a demand letter calling the balance due.[3]

The purchase agreement authorized GD & L to act as Mr. Anderson's nonexclusive agent for leasing the containers. GD & L was to use its best efforts to lease the containers for a period of thirty-five months, for which it was to receive an annual lease management fee of $1 plus 15 percent of the rent received.[4] Lease payments were to go first to satisfy the purchaser's interest payments and then into the sinking fund to repay the principal.

On December 31, 1983, GD & L issued confirmation statements purporting to show the purchase of the containers, the balance due under the agreement, guaranteed minimum annual lease payments and income and expenses for 1983 rental activity.

The GD & L container program was a sham. GD & L never bought or leased any containers for Mr. Anderson, and the statements it issued were false.[5] It is undisputed, however, that the Andersons did not know the program was a sham when Mr. Anderson made his investment.

Mr. Anderson had no experience in the marine dry cargo container business or in leasing containers, although he did have over thirty years' experience in the Navy and Naval Reserves and was familiar with cargo ships and dry cargo containers. He had also been involved in all kinds of leasing in his law practice.

Before making the investment, Mr. Anderson did not consult any industry experts, read no industry publications, did no research on the container leasing industry or the market for used cargo containers, did not investigate GD & L or its principals and did not inquire as to the identity of the lessees of the containers he was purportedly purchasing. Mr. Anderson learned of and made the investment through his neighbor and good friend, George Diachok, a registered securities dealer. Mr. Anderson testified that, in making his investment, he relied on his investment adviser (Mr. Diachok) and his accountant (Alvin Leach).

Mr. Diachok testified that he looked into the container program carefully and had his accountant and attorney review it and check out its structure. Mr. Diachok also spoke with GD & L's principal, looked into his background and checked his references, banks, other business connections and the Better Business Bureau. Mr. Diachok also

---

this action because the Andersons filed joint tax returns for the years in question.

2. Apparently, to reap the full tax benefits of the investment, the purchaser had to be at risk for about 20 percent of the investment. The $6,225 down payment plus the $19,920 recourse portion of the loan amounted to 21 percent of the total investment.

3. Mr. Anderson testified that he received the demand letter in late 1984 or 1985, about the time he learned there were problems with the investment. He claims he did not pay the alleged debt because he did not want to throw good money after bad. However, he also did not amend his income tax returns to change his tax treatment of the investment after he learned of the problems, even though he had three years to do so.

4. This figure, like most of those in the GD & L container program, was also chosen with the tax consequences in mind. It was contemplated that

GD & L's management fee would qualify as an operating expense, and during the first 12 months of the lease, operating expenses had to exceed 15 percent of the rental income for the taxpayer to treat the interest purportedly paid as a deductible business expense. *See* I.R.C. § 163(d)(4)(A) (1984).

5. GD & L's offering materials proved prophetic. They contained a series of questions and answers about the investment. In response to the question, "Aren't some leasing tax shelters considered 'abusive' tax shelters and therefore illegitimate?" GD & L responded, "We ... have heard of such schemes." Jt. ex. 7-G. It might have added, "And we decided to get in on them." Instead, GD & L went on to say, "It is not the form of the investment that is important—it is the expertise that goes into making it successful. All scams will mimic legitimate projects and are actually trading [on] the good name of the ones that have achieved success." *Id.* With the GD & L investment, form was everything. Apparently GD & L's only "expertise" was in trading on the good name of legitimate container businesses.

considered samples of confirmations describing GD & L's purported purchases of containers and checked with three different container manufacturers and sellers to determine if the prices GD & L was purportedly charging for containers were in line with market prices, allowing GD & L to be competitive with other companies in the industry. Mr. Diachok discussed these matters, as well as other investment alternatives, with Mr. Anderson, who concluded from GD & L's pro forma that GD & L looked like a reasonable business investment that could produce a sizable amount of income over a five-year period. Mr. Diachok received a $900 commission from Mr. Anderson's investment and also invested in the program himself.

Mr. Leach, the Andersons' accountant, discussed the offering circular with Mr. Anderson before he invested and told Mr. Anderson that he thought that "the tax aspects of it were flaky or overly aggressive, and he may have problems." Mr. Anderson responded that he thought the economics of the program were good and that he would make money regardless of the tax consequences.

Mr. Anderson also testified that he relied on the prospectus and other promotional materials GD & L furnished. The prospectus describes generally the containers, their use and the types of leases available. It states that GD & L has been in the container leasing business only since 1982. The prospectus says that GD & L will help purchasers lease their containers for a period of thirty-five months but that it has no obligation beyond that time to help the purchaser either lease or sell his containers. GD & L was to try to obtain short-term or "operating" leases. The prospectus indicates that rates for short-term leases vary greatly, depending on market conditions, but that they will not cover the purchaser's investment in the containers; to recover his investment, at the end of the lease period the purchaser will have to obtain renewal leases, find new lessees or sell the containers. GD & L made no representations about the resale value of the containers. According to the prospectus, a purchaser's ultimate cash return would depend in part on the container's ongoing value, which in turn depended on the quality of maintenance by the purchaser and lessee. The prospectus recognizes that the market for leasing containers is highly competitive and that the investment involves "substantial business and tax risks."

The prospectus emphasizes the tax benefits of the investment but adds that GD & L makes no representations about the tax consequences of the purchase and encourages the purchaser to consult with a qualified accountant or tax attorney before purchasing containers. The promotional materials also included a favorable legal opinion and an accountant's opinion from an international accounting firm. Mr. Anderson looked up the attorney who wrote the legal opinion in the Martindale–Hubbell legal directory and called her office to make sure it existed. The Commissioner does not claim that the materials misrepresent the program's tax consequences, assuming the program had not been a sham.

Mr. Anderson testified that he was interested in the program not only for its tax benefits but also for the long-range potential of earning some money to help with his retirement. He "assumed" that GD & L would keep the containers leased even after its thirty-five-month commitment to use its "best efforts" to lease the containers, but he also thought the containers were marketable if GD & L ever stopped leasing them for him. Mr. Anderson further testified that his investigation of GD & L was similar to his investigations of other investments he had made and that he relied heavily on his broker's representations and the broker's reputation and position in the community.

Finally, the Andersons offered expert testimony from a former IRS district director, who testified that some similar leasing programs were legitimate and that Mr. Anderson acted reasonably and consistently with how a prudent investor would act in checking out an investment of this type and magnitude.

On their 1983 tax return, the Andersons claimed a Schedule C business loss from their GD & L investment of $1,416 (due primarily to depreciation of the containers) and an investment tax credit related to the

investment of $6,251. For 1984 they claimed a loss of $1,595 and an investment tax credit of $5,447. They also claimed investment tax credits of $1,138 and $2,619 for tax years 1981 and 1982 respectively (carried back from 1983).

In 1988 the Commissioner issued a notice of deficiency to the Andersons for tax years 1981 through 1984, disallowing the losses and investment tax credits. The Andersons do not contest the deficiencies. The Commissioner also assessed additions to tax for negligence, under I.R.C. § 6653(a)(1) and (2), and for substantial understatement, under I.R.C. § 6661, as well as increased interest under I.R.C. § 6621. The Tax Court sustained the IRS's assessment of these penalties and interest,[6] and the Andersons appealed.[7]

## II. STANDARD OF REVIEW

■■■ We review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." I.R.C. § 7482(a)(1). We review the Tax Court's factual findings under the clearly erroneous standard and review its legal conclusions de novo. *Worden v. Commissioner,* 2 F.3d 359, 361 (10th Cir. 1993). We review mixed questions of law

and fact either under the clearly erroneous standard or de novo, depending on whether the mixed question is primarily factual or legal. *Armstrong v. Commissioner,* 15 F.3d 970, 973 (10th Cir.1994). Here, the underlying facts, which are set out above, are, for the most part, undisputed. The parties primarily dispute the conclusions the Tax Court drew from the facts.[8] Where, as here, " 'the sole issue is whether the law applied to the facts satisfied the statutory standard,' " we review the Tax Court's application of the law to the facts de novo, since we " 'are equally as able as the tax court to draw conclusions from the undisputed facts presented.' " *See National Collegiate Athletic Ass'n v. Commissioner,* 914 F.2d 1417, 1420 (10th Cir. 1990) (citations omitted). *See also First Nat'l Bank v. Commissioner,* 921 F.2d 1081, 1086 (10th Cir.1990) (findings of ultimate fact derived from applying legal principles to subsidiary facts are subject to de novo review).

## III. DISCUSSION

A. *Addition to Tax for Negligence Under I.R.C. § 6653(a)*

Section 6653(a)(1) of the Internal Revenue Code imposes an addition to tax equal to five percent of any underpayment of income tax liability if any part of the underpayment is

---

**6.** The Tax Court upheld the following deficiencies and additions to tax:

| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 |
|------|-----------|-----------------|-----------|
| 1981 | $1,138 | $ 57 | ---- |
| 1982 | 2,619 | 131 | ---- |
| 1983 | 4,269 | 213 | ---- |
| 1984 | 5,539 | 277 | $1,385 |

The Tax Court also upheld additions to tax under section 6653(a)(2) of 50 percent of the interest due on the deficiencies for each year and determined that each of the deficiencies was a substantial underpayment of tax attributable to a tax-motivated transaction for purposes of computing the interest due on the deficiency under section 6621(c).

**7.** Mr. Anderson was not the only GD & L investor against whom the IRS assessed penalties. In at least nine other cases the Tax Court has considered challenges to the Commissioner's imposition of penalties against taxpayers who purportedly purchased containers from GD & L. *See Schafer v. Commissioner,* 68 T.C.M. (CCH) 1216, 1994 WL 652250 (1994); *Marcinek v. Commissioner,* 66 T.C.M. (CCH) 1805, 1993 WL 534788

(1993); *Falligan v. Commissioner,* 66 T.C.M. (CCH) 1673, 1993 WL 526968 (1993); *Cleland v. Commissioner,* 66 T.C.M. (CCH) 1570, 1993 WL 516218 (1993); *Pelham v. Commissioner,* 66 T.C.M. (CCH) 820, 1993 WL 364820 (1993); *Amsler v. Commissioner,* 66 T.C.M. (CCH) 8, 1993 WL 244909 (1993); *Shortal v. Commissioner,* 64 T.C.M. (CCH) 847, 1992 WL 233001 (1992); *Urbauer v. Commissioner,* 63 T.C.M. (CCH) 2492, 1992 WL 55630 (1992); *Weiler v. Commissioner,* 60 T.C.M. (CCH) 1137, 1990 WL 163183 (1990). In all of these cases except *Pelham,* the Tax Court upheld the penalties. Of course, each case must be decided on its own, unique facts.

**8.** The Andersons claim the Tax Court erred by disregarding the uncontroverted evidence. The Tax Court did not disregard the undisputed evidence; it just accorded the evidence different weight than the Andersons do and drew different conclusions from it than the Andersons would have had it draw. It was up to the Tax Court, as the trier of fact, to decide what weight to give the undisputed evidence and what inferences to draw in the first instance.

"due to negligence or intentional disregard of rules or regulations (but without intent to defraud)." Section 6653(a)(2) imposes a further addition to tax of fifty percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. *See* I.R.C. § 6653(a).[9]

■ For purposes of section 6653, "negligence" is lack of due care or failure to do what a reasonable and prudent person would do under similar circumstances. *See, e.g., Schrum v. Commissioner*, 33 F.3d 426, 437 (4th Cir.1994). The Commissioner's determination of negligence is presumed correct, and the taxpayer has the burden of proving it wrong. *Allen v. Commissioner*, 925 F.2d 348, 353 (9th Cir.1991); *Holman v. United States*, 728 F.2d 462, 465 (10th Cir.1984).

The Tax Court concluded that the Andersons' underpayment of tax was due to negligence. The Commissioner does not contend that the Andersons' tax treatment of their investment would have been improper had GD & L been engaged in a legitimate business. Therefore, the Andersons' only negligence, if any, was in failing to discover that the program was a sham. We uphold the Tax Court's conclusion that the taxpayers were negligent but for reasons different from those the Tax Court relied on.

The Tax Court concluded that the Andersons were negligent because the materials and advice Mr. Anderson relied on in entering into the investment referred "almost exclusively" to the investment's tax benefits and contained "virtually no discussion of any long-term income-earning potential." Although the promotional materials emphasize the investment's tax benefits, they do contain information about its income-earning potential, including information about rental rates. In fact, they project "guaranteed" minimum yearly gross rent of over $30,000 a year for thirty-five months.

The Tax Court also concluded that Mr. Anderson's reliance on Mr. Diachok as an authority on the business prospects of the program was unreasonable in light of Mr.

Diachok's lack of knowledge and experience in the cargo container industry. However, one does not have to be an expert in an industry before he can invest in the industry himself or recommend an investment to another. Mr. Diachok checked out the background and references of GD & L's principal and checked with other companies in the industry to make sure that GD & L could be competitive given the rates it was charging. He also reviewed the structure of the investment with his accountant and attorney. Mr. Anderson was entitled to rely on Mr. Diachok's investigation. *See, e.g., Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir. 1990) (due care does not require moderate-income investors to investigate their investments independently; they may rely on the advice of their financial advisors and accountants).

The Commissioner suggests that Mr. Anderson's reliance on Mr. Diachok was unreasonable because Mr. Diachok was not a disinterested adviser but received a commission on Mr. Anderson's investment. But Mr. Diachok was not affiliated with GD & L. He was an independent insurance agent and registered securities dealer. Presumably, he would have received a commission on any investment he sold to Mr. Anderson. Mr. Diachok had a good reputation in the community, and he was sufficiently convinced of the merits of the container program that he invested in it himself. Under these circumstances, we do not think Mr. Anderson's reliance on his good friend, Mr. Diachok, was unreasonable. *Cf. Mauerman v. Commissioner*, 22 F.3d 1001, 1006 (10th Cir.1994) (it was not reasonable to expect a taxpayer to monitor his independent advisors to make sure they had done sufficient research to give knowledgeable advice).

Finally, the Tax Court held that Mr. Anderson was negligent for not conducting a more "meaningful" investigation in light of his accountant's concerns. However, his accountant's only concerns were with the proposed tax treatment of the investment. Mr. Anderson testified that he told his accountant that he was convinced that the program

9. Section 6653 has been amended substantially since 1984. References to the Internal Revenue Code are to the applicable code or codes for the years in question.

made economic sense even if he was not entitled to the favorable tax treatment GD & L had represented. Mr. Leach (the accountant) testified that he was surprised that Mr. Anderson had investigated the business prospects of the investment as much as he had. The Commissioner does not contend that the Andersons' tax treatment would have been improper if the container program had been bona fide, and there was no evidence that, if Mr.' Anderson had investigated the tax aspects of the program more thoroughly, he would have discovered that the program was a sham. In light of the undisputed evidence, Mr. Leach's concerns would not necessarily have caused a reasonable investor to investigate the business aspects of the program more thoroughly.

■ In short, the evidence supports the Andersons' claim that they acted as reasonable investors if the investment is viewed as a passive $6,225 investment in an on-going business. However, that was not how the investment was structured. In theory, at least, Mr. Anderson was not simply investing $6,225 in a business. He was buying $124,-500 worth of property. All the tax benefits the Andersons claimed were based on the assumption that Mr. Anderson owned and leased $124,500 worth of marine dry cargo containers.

Mr. Anderson testified that he was interested not only in the tax benefits of the investment but also in its long-range potential to earn money for his retirement. The investment's income-producing potential depended on the existence of real containers that would maintain their value over time and the existence of profitable leases. Mr. Anderson testified that he thought the containers he was buying had a useful life of ten to fifteen years, yet GD & L was only obligated to try to lease them for thirty-five months. There was no guarantee that GD & L would lease the containers during the initial thirty-five months, and after that Mr.

Anderson was on his own.[10] Moreover, the offering materials indicated that most container leases were for relatively short terms (from one trip to a few years). Yet Mr. Anderson never verified the existence of the containers, never sought to have them appraised, never registered them with one of the two internationally recognized container registries,[11] never tried to insure them or see that GD & L or the purported lessees purchased insurance, never asked the identities of his purported lessees or the terms of the purported leases and never asked to see even a sample lease.

In theory, at least, Mr. Anderson was at risk for much more than just his $6,225 down payment. He was required to make interest payments for five years. Although his personal liability on the loan was supposedly limited to $19,920, that presupposed annual payments of $18,675 into the sinking fund. It was contemplated that the interest and sinking fund payments would come from the rental income, which was all the more reason for Mr. Anderson to make sure that he actually owned containers and that they were actually being leased to actual lessees. Even the Andersons' expert witness testified that it would not have been reasonable to rely on the GD & L prospectus if the investor could reasonably expect to be liable for the balance of the purchase price, and, taking the offering materials at face value, Mr. Anderson could reasonably expect to be liable for much more of the purchase price than just his $6,225 out-of-pocket investment.

Mr. Anderson testified that he thought his $118,275 loan was secured by the containers, yet he never signed a security agreement or financing statement. If he had, he would have had to reasonably identify or describe his containers, see Colo.Rev.Stat. §§ 4–9–110 & –203(1)(a), and he may well have discovered they did not exist.

In short, we believe that a reasonable investor who was buying $124,500 worth of

---

10. Mr. Anderson testified that he thought GD & L would help him lease the containers even after its 35–month obligation ended, yet GD & L's own materials showed that GD & L had virtually no experience in the container business and no track record at leasing containers.

11. For a description of the recognized container registration services and a discussion of the importance of registration in the container industry, *see Amsler v. Commissioner,* 66 T.C.M. (CCH) 8, 10, 1993 WL 244909 (1993).

property for its long-term income-producing potential would have done more to verify that the property actually existed and was actually producing or capable of producing income. Indeed, the Andersons' own expert testified that an investigation and review of GD & L's operations and the underlying lease agreements would have been necessary to determine whether the purported tax benefits could be sustained if challenged by the IRS. He further testified that he would have done more investigation if he were investing $125,000 rather than $6,000, Mr. Anderson's cash outlay. Had the Andersons conducted a reasonable investigation, we believe they would have learned that the GD & L container program was a sham and that they were not entitled to the deductions and credits they claimed for the investment. Therefore, the Tax Court did not err in holding the Andersons liable for the addition to tax for negligence under I.R.C. § 6653(a).

## B. Addition to Tax for Substantial Understatement Under I.R.C. § 6661

Section 6661 of the Internal Revenue Code imposed a penalty of twenty-five percent of the amount of any underpayment attributable to "a substantial understatement of income tax for any taxable year." I.R.C. § 6661(a) (repealed 1989).[12] An understatement is the difference between the tax that should have been shown on the return and the tax that was actually shown. See I.R.C. § 6661(b)(2). An understatement is "substantial" if it exceeds the greater of ten percent of the tax required to be shown on the return or $5,000. Id. § 6661(b)(1)(A). The parties do not dispute that the Andersons substantially understated their in-

come tax for 1984, the only year for which the Tax Court imposed an addition to tax under section 6661.

The statute provides for a reduction in the amount of the understatement and hence the penalty if the taxpayer had "substantial authority" for his treatment of any item. I.R.C. § 6661(b)(2)(B)(i). However, this reduction does not apply to any item attributable to a "tax shelter" unless the taxpayer "reasonably believed" that his tax treatment of the item "was more likely than not the proper treatment." Id. § 6661(b)(2)(C)(i)(II). The Tax Court concluded that the GD & L program was a "tax shelter" within the meaning of section 6661 and that the Andersons had not set forth specific facts from which the court could conclude that they reasonably believed the tax treatment claimed was more likely than not the proper tax treatment.

The Andersons do not dispute the Tax Court's conclusion that the GD & L container program was a tax shelter but claim that they reasonably believed their tax treatment of the investment was more likely than not proper.[13]

■ It is undisputed that the Andersons' tax treatment of their investment would have been proper if the GD & L container program had not been a sham. Therefore, the Andersons could reasonably believe that their tax treatment of the investment was proper unless they had reason to believe the program was a sham when they filed their income tax return for 1984, the only year for which the Commissioner imposed an addition to tax under section 6661.

**12.** The penalty was originally 10 percent but was increased to 25 percent in 1986. See Pub.L. No. 99–509, § 8002(a), 100 Stat. 1874, 1951 (1986). The increased rate applied to penalties assessed after October 21, 1986. See id. § 8002(b), 100 Stat. at 1951. The Andersons' penalty was assessed in 1988. Section 6661 has been repealed with respect to returns due after December 31, 1989. See Pub.L. No. 101–239, § 7721(c)(2) & (d), 103 Stat. 2106, 2399, 2400 (1989). Accuracy-related and fraud penalties are now governed by sections 6662 through 6664 of the code.

**13.** Section 6661(c) authorized the Secretary of the Treasury to waive the addition if the taxpayer showed that there was reasonable cause for the

understatement and that the taxpayer acted in good faith. The Andersons also suggest that they had reasonable cause for the understatement and acted in good faith. However, the Andersons have not shown that they ever asked the Secretary to waive the addition to tax. Moreover, the statute makes waiver of the penalty discretionary with the Secretary, see Mauerman v. Commissioner, 22 F.3d 1001, 1004 (10th Cir.1994), and the Andersons have not argued, much less shown, that the Secretary abused his discretion in not waiving the penalty. The Secretary does not abuse his discretion by refusing to grant a waiver that was never requested.

The Andersons did not file their 1984 return until October 1985. They stipulated in the Tax Court that they realized there were problems with their GD & L investment "[b]y 1985." Moreover, Mr. Anderson testified that he received a demand letter in late 1984 or 1985 calling the balance of his loan due and that he ignored it because by then he had information indicating that the program was a "scam." In light of this evidence, the Tax Court did not err in concluding that the Andersons failed to meet their burden of proving that they reasonably believed their tax treatment of the investment was proper when they filed their 1984 return.

C. *Increased Interest Under I.R.C. § 6621(c)*

Section 6621 provides for an interest rate of 120 percent of the normal annual rate of interest for any "substantial underpayment attributable to tax motivated transactions." I.R.C. § 6621(c)(1).[14] The statute defines "tax motivated transaction" to include "any sham or fraudulent transaction." *Id.* § 6621(c)(3)(A)(v).[15]

■ The Andersons argue that section 6621 does not apply because Mr. Anderson did not go into the investment solely for tax

purposes but also to earn income. The Andersons' argument might have some merit if the statute made the taxpayer's motivation for entering into the transaction the determining factor. However, where the "tax motivated transaction" is a "sham or fraudulent transaction," the taxpayer's motivation is irrelevant. *Cf. Estate of Carberry*, 933 F.2d at 1129–30 (upholding the increased interest penalty for a sham transaction without considering the taxpayer's motive). *See also Jackson v. Commissioner*, 966 F.2d 598, 601 (10th Cir.1992) (the mere presence of a profit motive does not prevent a transaction from being a sham); *Cherin v. Commissioner*, 89 T.C. 986, 1000, 1987 WL 45771 (1987) (accord). The Andersons stipulated that the GD & L container program was a sham. Therefore, the Andersons are liable for increased interest under section 6621.[16]

AFFIRMED.

---

**14.** Subsection (c) was originally added to section 6621 as subsection (d) in 1984 and redesignated (c) in 1986. Increased interest under section 6621(c) applies only to interest accruing after December 31, 1984. *See* Pub.L. No. 98–369, § 144(c), 98 Stat. 494, 684 (1984); *Estate of Carberry v. Commissioner*, 933 F.2d 1124, 1129 (2d Cir.1991).

**15.** Sham and fraudulent transactions were added to the definition of "tax motivated transaction" by the Tax Reform Act of 1986. *See* Pub.L. No. 99–514, § 1535, 100 Stat. 2085, 2750 (1986). The Andersons do not dispute that the 1986 amendment applies in this case. *Cf. Hunt v. Commissioner*, 938 F.2d 466, 473 n. 14 (4th Cir.1991) (the increased interest rate under section 6621(c) applies retroactively to sham and fraudulent transactions so long as no final court decision with respect to the underpayment was entered before October 22, 1986, the date of the Tax Reform Act of 1986). *See also Kennedy v. Commissioner*, 876 F.2d 1251, 1256 (6th Cir. 1989) (citing Tax Court cases upholding the constitutionality of applying the 1986 amendment retroactively).

**16.** Even if Mr. Anderson's motive were relevant, there was ample evidence to suggest that Mr. Anderson invested in GD & L primarily for its

tax benefits. That evidence included the promotional materials, which emphasized the tax benefits to be derived from the investment, the structure of the program, which was carefully designed to take advantage of the then-existing tax laws and offered tax benefits four times the amount of the investor's out-of-pocket expenditures, Mr. Anderson's lack of experience in the container-leasing business, his failure to take steps a reasonable owner and lessor of containers would have taken, *see supra* pt. III.A, his apparent lack of interest in the profitability of the venture after he bought the containers, and his own testimony that "God only knows" that the tax benefits "had to be important" in making his investment decision. Mr. Anderson's testimony that he also had a profit motive for entering into the transaction is entitled to less weight than the objective factors mentioned above. *See Cannon v. Commissioner*, 949 F.2d 345, 351 n. 8 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3030, 120 L.Ed.2d 901 (1992). The Tax Court rejected Mr. Anderson's claim that he invested in the container program based on a good-faith belief that the program was a bona fide investment that could earn money for his retirement and not just a means of obtaining tax benefits. We cannot say that finding was clearly erroneous. And a taxpayer who enters into an invest-

ment primarily for tax benefits is subject to the increased interest assessment under section 6621(c), even if he also had a secondary profit motive. *See Kennedy*, 876 F.2d at 1257.