T.C. Memo. 2000-378

UNITED STATES TAX COURT

HARLAND AND SHIRLEY STONECIPHER, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8599-98.                    Filed December 14, 2000.

<u>Linda J. Van Arkel-Greubel</u>, <u>Donald M. Bingham</u>, and <u>Joseph P. Lennart</u>, for petitioners.

<u>Edith F. Moates</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes for 1993, 1994, and 1995 as follows:

| Year | Deficiency |
|------|-----------|
| 1993 | $37,804 |
| 1994 | 44,796 |
| 1995 | 49,306 |

After settlement of some issues, the primary issue remaining for decision is whether petitioners' cattle ranch activity qualifies as a for-profit activity.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

The parties have stipulated some of the facts, which are so found.  When they filed their petition, petitioners resided in Centrahoma, Oklahoma.

A sharecropper's son, Harland Stonecipher (petitioner) grew up on a family ranch in Oklahoma.  As a youth, petitioner was responsible for various chores on the ranch, helping to maintain and manage it and to care for the few head of cattle raised there.

Petitioner received a college degree with a major in education.  His first job out of college was as an insurance agent.

In 1972, petitioner founded Pre-Paid Legal, Inc. (Pre-Paid Legal), as a corporation to provide prepaid legal services to the public. During 1976, Pre-Paid Legal went public with a listing on the NASDAQ Exchange. In 1986, Pre-Paid Legal stock was traded on the American Stock Exchange, and as of the time of trial, Pre-Paid Legal stock was traded on the New York Stock Exchange. Since 1986, Pre-Paid Legal has been profitable. As of the time of trial, Pre-Paid Legal had accumulated $50 million in cash and investment assets.

During most of the years since 1976 and specifically during the years in issue, petitioner has worked as a full-time officer and employee of Pre-Paid Legal with such positions as chairman of the board of directors, president, and chief executive officer.

In 1975, petitioners paid $40,000 for 40 acres of property in Coal County, Oklahoma (the 40 acres). Over the years since 1975, petitioners' immediate family has occupied the residence on the 40 acres. Petitioners have improved the residence by adding three rooms, a bath, a sunroom, a three-car garage, and a carport at a total cost of $233,000. Petitioners have also improved the property immediately surrounding the residence by constructing hound kennels at a cost of $90,000 and a well house, two storage buildings, and a hay shed at a cost of $36,000. The cumulative cost of the 40 acres, the residence, and improvements described above was $399,000.

From 1981 through 1997, petitioners purchased additional unimproved property adjacent to or near the 40 acres, as follows:

| Year | Acres Purchased | Cost | Petitioners' Cumulative Total Acreage At Yearend |
|------|-----------------|------|--------------------------------------------------|
| 1981 | 50 | $10,000 | [1]90 |
| 1982 | 160 | 38,750 | 250 |
| 1985 | 220 | 66,000 | 470 |
| 1986 | 220 | 55,000 | 690 |
| 1992 | 300 | 75,000 | 990 |
| 1993 | 220 | 6,000 | 1,210 |
| 1995 | 60 | 18,000 | 1,270 |
| 1995 | 5 | 6,000 | 1,275 |
| 1996 | 320 | 96,000 | 1,595 |
| 1996 | 200 | 40,000 | 1,795 |
| 1997 | 40 | 10,000 | 1,835 |

[1] The 90 acres comprises the original 40 acres purchased in 1975 plus the 50 acres purchased in 1981.

Petitioners generally paid from $200 to $350 an acre for the property described above, much of which was wooded or partly wooded.

Also, during 1993, 1994, and 1995, petitioners leased 2,680 additional acres located near the above property.

By 1999, petitioners owned approximately 2,000 acres and leased an additional 2,680 acres. Petitioners' fee ownership and leasehold interest in the above property apparently did not include the right to mineral interests in the property.

Since 1982, when petitioners first purchased cattle to raise on their property, petitioners have made improvements to the property, in addition to those improvements previously mentioned,

related to raising cattle, at a cost to petitioners, where indicated in the record, as follows:

| Improvement | Cost |
| --- | --- |
| Barn | $40,000 |
| Cabin | 40,000 |
| 2-1/4 mile fence | 30,000 |
| 3 ponds | -- |
| Horse/cattle shed | -- |

During 1993, 1994, and 1995, petitioners' property was also the site of a tenant house and a mobile home, occupied for a period by petitioners' son.

Petitioners may be regarded as first-generation cattle ranchers in the sense that they did not receive or inherit any cattle from their parents. Instead, petitioners had to purchase their initial head of cattle. From 1982 through 1992 or 1993, petitioners sold the cattle that they raised each year, including all the male and female calves. After market prices fell in 1992, petitioner began retaining most of the female calves, until 1998, when he began selling them again.

Petitioners' cattle ranch may accurately be described as a no-frills cattle operation. Petitioners' improvements to the ranch property were not extravagant. Neither petitioners nor other members of petitioners' family, some of whom also lived on the property, made significant recreational use of the ranch property. There was no swimming pool, golf course, tennis court, Jacuzzi, or other significant recreational amenity. Petitioners

did not construct on the ranch any fancy or showy fences or make other improvements that would be indicative of a dude ranch.

The cattle petitioners purchased and raised on the property were Brahman crossbreed cattle suited to that part of Oklahoma because of their ability to tolerate rough grazing conditions, because of their thin hides that enabled them to tolerate the Oklahoma heat better than other cattle, and because of their high tolerance for insects and parasites.  Also, Brahman crossbreed cattle have smaller calves, making calving easier.  Petitioners' cattle were not shown at cattle shows.

Generally, petitioner worked only a limited number of hours on the ranch each week--an hour or two on weekday evenings and a number of hours on Sundays.  Occasionally, petitioner himself would participate in bulldozing the land and in worming, dehorning, castrating, branding, and vaccinating the cattle.

Since 1987, petitioner has employed on the ranch either one of his sons or another full-time hired hand.  On weekday evenings, petitioner occasionally would talk to his employed son or to the hired hand about management of the ranch. Occasionally, petitioner pulled calves out of the cows at calving and brush-hogged (cleared brush from) the land.

The ranch land was fertilized and sprayed for weeds. Rotational grazing of the cattle generally was not done in this part of Oklahoma, and it was not done on petitioners' ranch.

Over the years, petitioners undertook a number of changes or improvements to their cattle raising activity. They cleared, bulldozed, and brush-hogged portions of the property to make dirt roads and to improve the pasture for the cattle. As previously indicated, they built some fencing and three ponds. They planted Bermuda and Lespedeza grasses on some of the property.

Petitioners were thrifty and frequently looked for bargains in managing their cattle ranch. For example, at one point, petitioners made a bargain purchase of 26 tons of feed pellets. To store the feed, they poured all 26 tons of it through a chimney and into an unoccupied old ranch house on the property. For many years, they fed their cattle from old used bathtubs, which they purchased for this purpose, rather than spend $300 each for cattle feeders. In 1993, so that they could buy feed in bulk and thereby save on feed costs and related labor, petitioners purchased a bulk feed bin for $3,500. Also in 1993, to save on labor, petitioners changed from using square bales of hay to rolled bales.

During the years in issue, on condition that they be allowed to keep the hay for no charge, petitioners made a deal with the State of Oklahoma to cut and bale hay on a nearby State highway right-of-way.

Petitioners bought used trucks and equipment, including two junk trucks for parts.

Petitioners did not hire any ranch consultants to assist in managing the cattle ranch. Petitioners did not belong to a cattlemen's association.

During the years in issue and in prior years, petitioners maintained no formal books and records relating to the cattle ranch, no records of the cattle inventory, and no ledgers, written business plans, or written cost analyses. Petitioners maintained no records of which cows were bred, nor of which cows were calved and sold.

Petitioner did make some miscellaneous handwritten notes about the cattle on scratch pads, which he generally kept on the dashboard of his truck for a while before discarding.

During 1993, petitioners maintained no separate bank account relating to the ranch activity. Rather, financial matters relating to petitioners' personal and family activities and to the ranch activity were handled through the same bank account. During 1994 and 1995, petitioners did maintain a separate bank account for financial activity relating to the cattle ranch.

For the years in issue, petitioners retained receipts relating to expenses incurred in connection with the cattle ranch activity.

Petitioners estimate that as of 1999 the property and improvements on the ranch had a market value of approximately

$750,000 and that the equipment, vehicles, and bulldozer on the ranch had a market value of approximately $335,000.

Petitioners have never realized a profit from their cattle ranch activity. On their joint Federal income tax returns for 1993, 1994, and 1995, petitioners claimed ordinary expense deductions relating to the cattle ranch activity, and they claimed depreciation deductions relating to a house, a cabin, a mobile home, and other improvements and equipment located and used on the ranch. The schedule below reflects the gross receipts, expenses, depreciation, and net losses relating to petitioners' cattle ranch activity that were reported on petitioners' joint Federal income tax returns for 1983 through 1997:

| Year | Gross Receipts | Expenses (Excluding Depreciation) | Depreciation | Net Loss |
|------|------|------|------|------|
| 1983 | -- | $25,793 | $15,834 | [1]$41,627 |
| 1984 | $3,621 | 34,195 | 24,680 | [2]55,254 |
| 1985 | 3,200 | 20,414 | 26,092 | 43,306 |
| 1986 | 6,213 | 39,016 | 32,419 | 65,222 |
| 1987 | 2,745 | 26,096 | 45,084 | 68,435 |
| 1988 | 361 | 57,128 | 44,968 | 101,735 |
| 1989 | 1,013 | 50,905 | 32,915 | 82,807 |
| 1990 | 23,174 | 72,540 | 25,935 | 75,301 |
| 1991 | 20,021 | 70,169 | 16,853 | 67,001 |
| 1992 | 7,240 | 74,345 | 25,645 | 92,750 |
| 1993 | 17,162 | 87,921 | 32,637 | 103,396 |
| 1994 | [2]8,528 | 71,605 | 48,690 | 111,767 |
| 1995 | 14,268 | 72,903 | 53,408 | 112,043 |
| 1996 | 6,746 | Unknown | Unknown | 111,291 |
| 1997 | 16,618 | Unknown | Unknown | 97,463 |

[1] Includes losses from a coon dog activity.
[2] For 1994, petitioners also reported a capital gain of $41 relating to the cattle activity.

For all years in issue (and apparently for all of the other years indicated above), on petitioners' joint Federal income tax returns, the reported net losses from petitioners' cattle ranch activity offset and reduced petitioner's substantial taxable income from Pre-Paid Legal.

On audit, respondent determined that petitioners' cattle ranch activity was not operated for profit and disallowed their claimed net losses relating thereto.

OPINION

Under section 183(b)(2), if an activity engaged in by an individual is not engaged in for profit, deductions relating

thereto are allowable only to the extent gross income derived from the activity exceeds deductions allowable under section 183(b)(1) without regard to whether the activity constitutes a for-profit activity. See Allen v. Commissioner, 72 T.C. 28, 33 (1979).

For purposes of section 183, an activity is not considered engaged in for profit unless it is conducted by the taxpayer with an actual and honest objective of making a profit. See Hildebrand v. Commissioner, 28 F.3d 1024, 1027 (10th Cir. 1994), affg. Krause v. Commissioner, 99 T.C. 132 (1992); Antonides v. Commissioner, 91 T.C. 686, 693-694, 696-697 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Dreicer v. Commissioner, 78 T.C. 642, 645-646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Petitioners have the burden of proof. See Rule 142(a); Cannon v. Commissioner, 949 F.2d 345, 348-349 (10th Cir. 1991), affg. T.C. Memo. 1990-148.

The regulations under section 183 provide a nonexclusive list of factors to be considered in determining whether an activity is engaged in for profit. The factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort the taxpayer expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other

activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the taxpayer's financial status; and (9) whether elements of personal pleasure or recreation are involved. See sec. 1.183-2(b), Income Tax Regs.; see also Cannon v. Commissioner, supra at 348-349.

The taxpayer's expectation of profit need not be reasonable but must be in good faith. See Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner, supra at 33; sec. 1.183-2(a), Income Tax Regs. In determining whether an activity is engaged in for profit, greater weight is given to objective factors than to a taxpayer's mere statement of intent. See Anderson v. Commissioner, 62 F.3d 1266, 1274 n.16 (10th Cir. 1995), affg. T.C. Memo. 1993-607; Cannon v. Commissioner, supra at 351 n.8; sec. 1.183-2(a), Income Tax Regs.

Although no one factor is conclusive, see sec. 1.183-2(b), Income Tax Regs., a record of substantial losses over many years and the unlikelihood of achieving a profit are indicative that an activity is not engaged in for profit, see Hildebrand v. Commissioner, supra at 1027; Cannon v. Commissioner, supra at 352; Golanty v. Commissioner, supra at 426; sec. 1.183-2(b)(6), Income Tax Regs.

Before, during, and after the years in issue, the limited time petitioner spent working in the cattle ranch activity is inconsistent with a legitimate for-profit objective. The lack of formal books and records, of a ledger, of a budget, and of a meaningful business plan for the ranch indicates that petitioners' ranch activity was not carried on in a businesslike manner.

Petitioners used the ranch for a personal residence and apparently intended to retire there. Petitioners' ranch activity realized losses every year, and from 1983 through 1997 it accumulated, before depreciation, approximately $700,000 in total losses.

Petitioner acknowledges that he had no expectation of realizing income from the ranch in any of the early years. Petitioner states that his intention for the ranch was, over the course of 15 years, to retain female calves born each year and, by breeding the cows, to build up the cattle herd to 500 mature cows and to build up the total ranch acreage to 2,000 acres. At that point, by the sale of female calves that would be born each year, petitioner claims that he expected the cattle ranch to provide comfortable retirement income for him and his wife.

Petitioner's assertions as to his long-term strategy with regard to the ranch are undermined by the lack of breeding and calving records and by petitioners' sale each year (at least

through 1992 and possibly through 1993) of all their female calves.[1] These circumstances speak loudly to the nonprofit nature of petitioners' cattle ranch activity, particularly where the buildup of the cattle herd and the profit were to be based on the successful breeding of the cows.

Petitioners claim that the for-profit nature of the cattle ranch is indicated by, among other things, the no-frills nature of the property, the lack of recreational use of the property, and the alleged long-range plan or purpose to use income from the ranch to support petitioners in their retirement. With regard specifically to the alleged long-range plan, petitioners offered into evidence a calendar for 1983 on which were entered a few brief words as follows:

> Retire age 60 — 1998
> 2500 acres paid
> 500 mama cows paid

We do not believe that this brief calendar entry adequately corroborates the existence of a long-range business or profit plan for the ranch. Rather, we regard the calendar entry as reflecting, at most, a general goal or desire. The credible

[1] The parties have stipulated that "During the years 1982 through 1993, petitioners sold the cattle raised each year." Petitioner testified, on the other hand, that he temporarily stopped selling heifers after a 1992 price drop. To the extent there is a discrepancy, we do not view it as material to our analysis or to the result reached herein.

testimony and other evidence in the record do not support petitioner's claim that he established a meaningful business plan for the ranch. Contrary to petitioner's testimony that his business plan (during the years before us and in prior years) was to retain female calves and to sell only male calves, in many years petitioners sold the female calves along with the male calves.

Acknowledging that he maintained no formal books and records for the ranch activity, petitioner emphasizes that he did keep all expense receipts and was able to substantiate, to respondent's satisfaction, the ranch-related expenses claimed on petitioners' tax returns. We believe, however, that these circumstances are more indicative of good tax planning than operation of a for-profit business.

The credible evidence does not establish that petitioners' cattle ranch was operated for profit. The ranch never came close to making a profit. Petitioner testified that he did not believe he would ever achieve profitability as long as he was buying land, but thereafter he could "revive" it. Petitioner testified:

> I don't know that you can ever become profitable in
> this business if you're first generation [raising
> cattle]. * * * if you start at ground level zero, you
> don't own an acre of land, you don't own a cow, you
> have got to buy the land and improve it and put the
> cattle on it, I don't know if you would ever reach
> profitability that way.

Petitioner's statement reveals that he viewed the ranch activity as having no profit potential for the years in issue, during which petitioners were continuing to acquire significant acreage, improve it, and put cattle on it.  Rather, it appears that petitioner actually anticipated incurring losses from the ranch activity over a long period, including the years in issue and thereafter.  Petitioner's anticipation of these ongoing losses as being practically inevitable, rather than the result of unpredictable events, signals the absence of an actual and honest profit objective with respect to the ranch activity during the years in issue.  See Mattfeld v. Commissioner, T.C. Memo. 1992-273, affd. without published opinion 15 F.3d 1087 (9th Cir. 1994).  We are not persuaded that these losses are attributable merely to a startup period, of a kind which is customarily necessary to bring such an activity to profitable status, especially since petitioner's annual selling off of female calves during the first 10 years of operation was inconsistent with his own asserted business plan.

Petitioners' witnesses gave vague testimony based on general observations and not supported by a professional and thorough appraisal of petitioners' cattle ranch activity.

On the basis of all the evidence, we conclude that petitioners have failed to establish that they engaged in the

ranch activity with an actual and honest objective to make a profit within the meaning of section 183.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.